# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **NO. 4:16-CR-00001** |
| | : | |
| **v.** | : | **Judge Brann** |
| | : | |
| **ROBERT ELDER** | : | **Filed Via ECF** |

### Sentencing Memorandum

*I have acquired new wisdom ...or, to put it more critically, have discarded old ignorance.[1]*

## I.    Introduction

On January 6, 2016, Robert Elder,  a 40 year old who lives with his parents and has never been in trouble, pled guilty to one count of Possession of Child Pornography in violation of Title 18 United States Code, Section 2252.[2]  Robert Elder never produced, created or disseminated child pornography.  Although Mr. Elder has no criminal history, and by any measure is among the least serious offenders subjected to the child pornography sentencing guideline, his total offense level before acceptance of responsibility is 31, the same as if he had robbed a bank at knifepoint and abducted the teller.

Robert Elder consumed child pornography – nothing more and nothing less -- and, unlike the typical criminal defendant who may appear before this court, he took no steps, sophisticated or otherwise, to hide his actions. This is not an offender who "does not get it" and only opportunistically, pretends to.  Robert Elder admitted everything to law enforcement – he was

---

[1] Justice Scalia's concurrence in *Ring v. Arizona*, 536 U.S. 584, 611, 122 S. Ct. 2428, 2444 (2002)

[2] The maximum penalty for that offense is imprisonment for a period of 20 years, a fine of $250,000, a maximum term of supervised release of life.

candid and honest.  He undertook mental health counseling, revealed his secret to his parents and loved ones, and committed himself to work and rehabilitation.  He has remained employed and compliant with his electronic monitoring supervised release conditions.   Every piece of evidence in this case points in the same direction:  Robert Elder presents no danger to children or society; can be, and is in the process of being, rehabilitated, and; as a forensic psychiatric examiner wrote, is to "pitied more than condemned."

## 2.    Facts and Circumstances of the Offense[3]

Robert was swept up in an October 2010, United States Postal Inspection Service investigation into a movie production company that trafficked in child pornography.  Elder placed orders with the company which led to his arrest.   Mr. Elder took no steps to hide his identity or engage in subterfuge when ordering:  He used his home address and IP addresses when responding to billing questions.

A search of Mr. Elder's family home yielded 1,302 objectionable images.  Following the search, Mr. Elder participated in an extensive and uniquely candid and exposed interview with a postal service agent.   He admitted to purchasing material from the company and that he occasionally masturbated to child pornography images.  Mr. Elder told the agents when and how he first became interested in child pornography and described his urges.   The agents administered a polygraph examination in which they specifically asked Mr. Elder whether he "ever engaged in, or participated in, a sex act with anyone under the age of 18 during the previous 15 years of [his] life."[4]  The defendant indicated that he had not, and it was the opinion of the examiner that Elder was telling the truth.

---

[3]  This section is gleaned from the July 27, 2016, version of the Presentence Report.
[4]  See Polygraph Report, attached as Exhibit A.

3.      **Mr. Elder's History and Characteristics**

Robert is an only child who has lived at home with his parents his entire life. Both his parents were born and raised in Centre County. His father, Bill Elder, is a retired auto salesman and his mother, Sharon Elder, is a longtime PSU staff member and currently the Administrative Staff Assistant for the Department Head in Computer Science and Engineering.   Mrs. Elder describes Robert as "very much a loner and that trait became even more pronounced as he grew older. . . . [who became] consumed [with] and even addicted to the purchasing and hoarding of goods . . . whether the item was necessary, a duplication of one already in his possession or useful. . . . [many of which] remain unopened, given to someone, stored at another person's house, packed in tool boxes, or cast on a never ending pile."[5]   Mrs. Elder details Robert's promising response to his criminal circumstances:

> I will say at the onset that I do not condone Robert's actions  . . . but I know he is deeply sorry.  I have closely watched him since the postal inspection investigation and see many changes to his lifestyle.

> Despite working under very difficult circumstances and being abandoned by people he perceived as being supportive, he still has a genuine interest in caring for people. He maintains contact with several of the elderly people he has helped with various tasks or regularly visited.  He frequently asks us to check on someone, if he is not able to reach them by phone.

> He has taken many steps to correct his actions and regularly sees two different psychologists in an effort to find help as quickly as possible.  We have seen a positive change in Robert's outlook since he began counseling and was finally able to talk about his pain, isolation and the urges that haunt him.

Mrs. Elder also reflects upon the importance of Robert's physical presence: "Robert is our only child and I recognize how deeply a prison sentence will affect our whole family unit.  We are getting to the point in life where we need help with many duties around the home and would

---

[5] Letter of Sharon Elder, attached as Exhibit B.

greatly appreciate your consideration."

Robert's father, Bill Elder, also describes Robert as someone who while growing up "want[ed] to be alone" and had a "hard time making friends."[6]  Robert did "well in school and we didn't have any problems with him. He is hard-working and does help other people, especially some of the elderly."  Mr. Elder feels that Robert has "done a good job of following all the restrictions and guidelines.  He does not try to do anything that would be detrimental to his conditions.  He goes to work at Pro-Build which he has worked there for a little over 3 years and comes directly home. I think this is helping him be more regimented.  Robert "knows it was wrong what he did . . .  I know he is a trustworthy person and would not be a harm to anybody, but would be more of someone who would be a help to them."

Robert was very close to a favorite uncle who passed away from pancreatic cancer in fall 2015. As his uncle was dying, Robert prayed for a miracle to save him.  Before being confined to his house, Robert would typically work from 6am to 3pm and then go to help in his aunt and uncle's house, Dorothy and Tom Davidson.

Robert did well in school, getting mostly A's and B's. After graduating from State College Area High School in 1993, he initially attended Penn State but became deeply depressed and particularly uncomfortable in the large classes.  Robert switched to Lock Haven University where he received a B.A. in Elementary Education although he did not become certified to teach and never taught.  He does not drink (aside from a rare beer) and has never done drugs.

Robert is currently working for Pro-Build delivering construction supplies, mostly drywall and insulation. He has earned a CDL B-class license and is very proud of his

---

[6] Letter of Bill Elder, attached as Exhibit C.

advancement.   Robert's former supervisor, Troy Trude, General Manager at The Ciesco Company since April 2016 and former General Manager for Pro-Build wrote:[7]

> In April 2013 I hired Robert Elder in the labor position. In the time since, Robert has become one of the delivery drivers for Pro-Build. He has always been a very reliable employee, always very punctual, does whatever he can do to complete all work assignments, working long hours and is always willing to work extra if asked. He also gets along well with other employees and with the customers at the jobsites. In the time I have known Robert, he has shown to be very dependable, loyal and willing to give others a helping hand. If a position with The Ciesco Company would become available, I would not hesitate offering Robert a job.

Robert's character letters speak to his honesty, commitment to family and friends, benevolence, and generosity – always willing to help a neighbor or friend with tough, dirty and thankless work and checking in on them to make sure they are ok or to see if they need anything. Each writer speaks to Robert's candidness and remorse in discussing his offense and their belief that he does not need to be incarcerated.

Robert's aunt, Dorothy Davidson, a law firm secretary and office manager for the past 52 years, wrote:[8]

> Throughout our relationship, I've always noticed the friendly and benevolent nature in which [Robert] would interact with other family members and friends. He is honest, has never been in trouble before and is always willing to lend a helping hand to family and friends in need.   Personally, I can speak to the countless hours Robert spent with my [late] husband at our home.   He helped us with yardwork, small building projects and heavy lifting on numerous occasions and his presence was always welcome.
>
> Our neighbor, Angelina Holden, is an elderly widow with no family that currently lives in the United States.   Robert has spent countless hours helping her around the house. . . . This same neighbor had a bad fall from which she sustained a broken neck and numerous contusions.   Robert was the first person she called for

---

[7] Letter of Troy Trude, attached as Exhibit D.

[8] Letter of Dorothy Davidson, attached as Exhibit E.

help, and he was instrumental in her transport to the hospital for emergency treatment and care. When she was discharged from the hospital, Mrs. Holden was placed in the care of Center Crest Nursing Home where Robert visited her frequently until she was able to return home. I believe this specific instance speaks to the compassion and consideration that Robert shows all of his friends and family.

I know he has been charged with a violation of the law, but I don't feel his sentence would be best served in prison. He is a kind and hardworking individual who I believe is an attribute to society. Robert made a mistake for which he is truly sorry: A sentiment he has personally shared with me on many occasions throughout the past months.

Angelina Holden, retired Penn State Library employee, and the neighbor Aunt Dorothy referred to, has known Robert since he was a small child. Ms. Holden wrote:[9]

[Robert] has been a great help to me in completing many of the tasks around my house. My husband died many years ago so it was great to have someone I could depend on to do various tasks. It did not matter whether the weather was very hot or very cold, when a favor was asked he was more than willing to help. He also checked on me when I did not ask just to make sure I was okay. If I needed taken to the store for groceries or other items, he very willingly made this happen.

Robert is quiet and hesitant to be around large crowds and pretty much keeps to himself but always made time to help me. He would pick me up and take me to places . . . I very much looked forward to him spending time with me as his patience and kindness was very important. I am originally from Mexico and I do not have any family members living in the U.S. so having someone that I am comfortable asking to do things is quite limited.

When Robert was put under investigation in 2014, he was very honest and open in telling me. He is extremely sorry for his actions. Even through all the difficult times, Robert has still continued to contact me and worry that I was fine. I know that Robert has made a huge mistake but I still value his thoughtfulness, generosity and concern.

First cousin and senior Penn State Data Administrator Thomas L. Davidson wrote:[10]

---

[9] Letter of Angelina Holden, attached as Exhibit F.
[10] Letter of Tom Davidson, attached as Exhibit G.

Over the years the strongest impression I have of Robert is of his generous and tireless service and support of family members and friends alike. From garden, yard and construction projects, to odd jobs for elderly neighbors, Robert has generously volunteered his time and efforts to help the family and friends in innumerable ways. . . .I have been a part of his work crew on many occasions. Often the first to arrive, Robert is frequently the last to leave.

Robert is thoughtful, gentle and kind. He would regularly take the elderly neighbor out shopping and helps with odd jobs around the house.

Robert has expressed to me multiple times that he's truly sorry for the mistake that he made. Robert has been a productive member of society for as long as I have known him, and has never been in any trouble before this. I don't believe incarceration would be productive for Robert or society as a whole.

Childhood friend Dorothy Engleman wrote:[11]

I have known Robert since we were in the same grade at the Bellefonte Area Middle School. I recall Robert as being quiet and a loner much like myself. He did not get into trouble and the teachers liked him. I became reacquainted with him several years ago when we moved to our present home and he helped while we got settled. He also became friends with both my husband and I. He was very willing to lend a helping hand with anything we asked. We could count on him to do any type of labor, assist if Harold needed an extra hand, or should Robert have the tool or machine to get the job done, he would willingly loan it to us. It was not only by assisting in work related projects, we also enjoyed having him as our friend. He has always been welcome at our home. He frequently stopped by just to talk and visit. I enjoyed our visits and being able to talk with someone that was in school with me as we went through the same types of feelings of loneliness and not having many school friends. Robert is very trusting and helpful and thought everyone had the same giving character, even when cautioned that the person he was dealing with was not. He interacted very well with my whole family, including my two daughters, who are twelve and thirteen. We liked having him around so much that we included him in several of our meals including Christmas dinner.

Robert has made a great mistake and I know how difficult it was for him to tell Harold and I about it. Once again, I admire his honesty in coming forth and talking with us. I know he is now receiving counseling to understand why he acted in the manner he did. For my family, we still think very highly of him and know what a good friend and helper he is to our entire family. We feel Robert deserves a second chance in society.

---

[11] Letter of Dorothy and Harold Englemann, attached as Exhibit H.

Richard Greninger, retired math teacher and long-time family friend, wrote:[12]

> He just plain liked to help anyone . . . I always felt very good when I was around Robert. I think he was and is very trustworthy. I always thought Robert was very nice and kind, for I do not know many people that would jump in and help with the types of dirty work like putting insulation in a ceiling…

> Robert comes from a very good family..[he] is not a bad person, and I think he made a poor judgment. . .

> My feeling about Robert is that he should not get or be in prison, for he is not that type of person. I think he needs to get a scolding and maybe some counseling but not prison. I talked to Robert on the phone about a month ago, and the feeling that I got out of our conversation was that he made very poor judgment and was very sorry for it.

## A.  Forensic Psychiatric Examination[13]

Forensic Psychiatrist Joseph S. Silverman, MD, completed a forensic examination of Mr. Elder. His examination revealed that:

- "Robert has always been a loner…who was an avid collector of motion picture videotapes…Robert owns about 5,000 of these videos."

- Mr. Elder's sexual stimuli is "videotapes depict[ing] young boys taking their clothes off and showering. He was not especially interested in observing sexual activities involving young males."

- Mr. Elder's mood evaluation "score is compatible with a mildly depressive outlook with several low-grade symptoms."

- That Robert's mother, Sharon Elder, advised that there were no male relatives who "demonstrated pedophilia tendencies or were unmarried."

- "The Elders immediately specified their son's severe hoarding disorder. … his purchases clutter the entire house not only the motion picture collection but multiples of many other items -- like wrenches -- some still in unopened packages."

---

[12] Letter of Richard Greninger, attached as Exhibit I.

[13]  Report and CV of forensic psychiatrist Dr. Joseph Silverman, attached as Exhibit J.

- "For Mr. Elder, the direction of his sexual attraction is toward young males in a voyeuristic manner. "

Dr. Silverman diagnosed Robert with chronic dysthymia; paraphilia with social interest in preadolescent boys with observation of nudity being fundamental as opposed to sexual activity, and; hoarding disorder. Dr. Silverman felt that Robert is "more to be pitied than condemned. Through no fault of his own, he has been cursed with two rare conditions: paraphilia (fortunately without predation) and hoarding disorder, with an accompanying minor trait like eyelid tick, intonation abnormality and indifference to personal hygiene. The clinical picture bears similarities to autism and paranoia."

Dr. Silverman noted that Robert was working with multiple therapists and that there was "no doubt that Mr. Elder can benefit from ongoing psychotherapy and, perhaps most important, group therapy as mechanisms for gaining insight into his own self-preservation and to develop ideas for future social ventures."  Dr. Silverman concluded that Robert "has a vital need for compassion from others, *especially* since he lacks appealing qualities…that typically evokes sympathy…hoarding, incidentally, is not simply a bad habit.  It is the result of the brain's inability to evaluate the importance and the classification of individual objects."  "In a way, he has been heroic, bearing with a burdensome existence with no obvious basis for hope.  Meantime, he possesses a negligible threat to society.  He presents no real danger to living children."

Dr. Silverman speaks to what incarceration would like for Mr. Elder: "What might be the fate of Robert Jason Elder from prison for a significant period of time?  The very idea is tough to ask -- poignantly horrific.  This is a man with two major genetic oddities -- pedophilia and hoarding.  In his home environment he barely makes it through using isolation as a primary

9

defense mechanism. He has probably inborn aversiodn to close human contact. He has strong suicidal impulses when under stress. As a "different" kind of person and a supposed violator of children, he would be a likely target for a brutal fellow prisoner seeking to elevate his jailbird sense of importance and worthlessness by overpowering and humiliating someone else."

B. **Treatment Providers**

**John Erickson, Ph.D.**[14]

Licensed Psychologist John Erikson, Ph.D., is providing ongoing treatment to Mr. Elder. They have had 22 sessions to date. Dr. Erikson wrote that during his initial session, Robert "wonder[ed] why God put me here." "[T]hroughout his life, others have taken advantage of him and let him down…and that much of his dynamic with people has been set up by low self-esteem he has experienced since childhood…social isolation, such as Robert's, is a risk factor in pedophilia." Dr. Erikson notes the importance of "work and [being] highly productive." Robert told him that "I like to work, it feels good to help, and it keeps my mind off life."

"Disillusioned with and perplexed by his peer relationships, he has reported that it has been easier for him to relate to children, who he feels empathy for." Robert "admit[ed] regret that his activities with pornography may have contributed in some way to hurting children with genuine regret, he reports 'I know what I did was wrong. I went too far.'"

Erikson describes Elder's prognosis in psychotherapy as "good". According to Erikson, Robert "demonstrates a capacity for insight…and is motivated to change…" Further, that Robert is trying to "maintain hope and faith that 'maybe someday God will help me understand my

---

[14] Dr. John Erickson's September 7, 2016, letter and CV, attached as Exhibit K.

purpose here' and why he has "experienced so much pain in his life."   According to Erikson, Robert stated that he "does not want to harm children, even if indirectly through pornographic material."

Erikson said that the focus of his psychotherapy includes "better understanding and management of any sexual urges he may have that are stimulated by or toward children, helping Robert to find ways to let go of unneeded stress and achieve different perspectives on things that bother him, determining ways for him to achieve greater satisfaction and success socially to reduce isolation, improve self-esteem, and provide restoration of hope. [Dr. Erickson is] quite optimistic that Robert will be able to make progress in his psychotherapy, contributing to reduction and management of pedophiliac urges." Dr. Erickson concluded that: "[t]here was no content or history presented in our psychotherapy sessions which suggested that Robert has directly been or would be of future harm or danger to children or others, however, especially with adequate treatment."

**Barry Brink, Ph.D.[15]**

Clinical Psychologist Barry R. Brink, Ph.D., is also treating Mr. Elder.  He states that in counseling, "Robert has been forthcoming regarding the situation and the behaviors that led to his current legal charges.  He has also reviewed his past history of mental health issues, social interaction, and employment, and has been receptive to discussing the longer psychological picture of attitudes and moods which have contributed to his current difficulties."

"Robert is receptive to feedback and appears motivated to doing whatever is necessary to rectify his current trouble.  In my clinical opinion, I do not see Robert as a potential threat to the

---

[15] Barry Brink, Ph.D. August 4, 2016, letter and CV, attached as Exhibit L.

emotional or physical well-being of other people."

4.    **Applicable Statute**

Mr. Elder pled guilty to one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B).[16]  The maximum term of imprisonment is twenty years with a minimum term of supervised release of five years. 18 U.S.C. § 3583(k) (2015).

5.    **Guidelines Sentencing Range**

The total Guidelines offense level is 28. The criminal history category is I, yielding a Guidelines imprisonment range of 78-97 months.   The offense level was calculated by the probation department as follows:

- Base offense level of 18 pursuant to U.S.S.G. § 2G2.2;

- Two-level pre-pubescent minor pursuant to U.S.S.G. § 2G2.2(b)(2);

- Four-level depictions of violence, pursuant to U.S.S.G. § 2G2.2(b)(4);

- Two-level use of a computer pursuant to U.S.S.G. § 2G2.2(b)(6);

- Five-level number of image enhancement pursuant to § 2G2.2(b)(7)(D);

- Two-level   reduction   because   defendant   demonstrated   acceptance   of responsibility for the offense, pursuant to U.S.S.G. § 3E1.1(a), and;

- One-level reduction because the government was informed in a timely manner of defendant's intention to plead guilty, pursuant to U.S.S.G. § 3E1.1(b).

---

[16] Any person who . . . knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce . . . by any means including by computer, if – (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct[.]

Mr. Elder has no prior criminal history and accordingly, as a criminal history Category 1, his guideline range is 78 - 97 months.  Per the plea agreement, the Government recommends 78 months imprisonment.

## 6.  Sentence Requested

Robert Elder asks this court to impose a sentence that emphasizes extended in-home detention with electronic monitoring, aggressive supervised release, employment, and continuing treatment over prison warehousing.  If the Court finds that incarceration is necessary, it should be for no longer than is reasonably necessary for Mr. Elder to avail himself of the BOP's Non-residential Sex Offender Treatment Program which generally takes 9-12 months, exclusive of the classification process.[17]  The court should also take into account Mr. Elder's time served since January 26, 2016 on home detention with electronic monitoring pretrial release when deciding whether and how far to vary from the guideline range.  As discussed below, the requested sentence is "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

## 7.  Relevant Child Pornography Guideline History

In *U.S. v. Grober*, 624 F.3d 592 (3rd Cir. 2010), our Circuit reviewed a pioneering district court decision that declined to sentence within the 2G2.2 guideline.[18]  In reviewing the district court's policy-based downward variance from § 2G2.2, the Court applied an abuse of discretion standard because "the [Sentencing] Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to

---

[17]  BOP's Sex Offender Treatment Program Summary, attached as Exhibit M.

[18]  *U.S. v. Grober*, 595 F.Supp.2d 382 (D.N.J. 2008)

changes adopted or directed by Congress." *Id.* at 608.  The *Grober* court found the sentencing court's policy level 2G2.2 disagreement to be "compelling, and well-grounded in the § 3553(a) factors. . . . It adequately explained why it found § 2G2.2 flawed and why it varied from the recommended sentencing range to the ultimate sentence it imposed, which, it bears repeating, the government does not challenge." *Id.* at 609.  The *Grober* court added that the district court's "decision now stands on even stronger ground" given the "wealth of resources (some of which will be discussed in this memorandum) that have become available since the sentencing in this case. . . ." *Id.* at 609.

The *Grober* court explained the guideline's history:

> When § 2G2.2 was first promulgated by the Commission in 1987, it had a base offense level of 13 —nine levels lower than it is today for transportation, distribution, and receipt offenses—and contained only two enhancements, one for material depicting a child less than twelve years old (two levels) and one for the retail value of the material distributed (at least five levels). The Commission promulgated § 2G2.4 in 1991 to address the then-recently federalized crime of possession, and proposed to set the base offense level at 10—eight levels lower than it is today—and included only a two-level enhancement for material depicting a prepubescent minor or child under the age of twelve. Members of Congress were vocal in expressing their concern that the Guidelines ranges were not high enough for child pornography offenders—these were "smut peddlers" and "pedophiles"—but the Commission defended the Guidelines, noting that they "continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice" and that data suggested that judges and prosecutors thought "that the offense level for the least serious forms of conduct under § 2G2.2 was too severe.  Congress specifically directed the Commission, however, to make a variety of changes to § 2G2.2 and § 2G2.4, including raising the base offense levels to at least 15 and 13, respectively.
>
> In 1995, Congress again specifically directed the Commission to raise the base offense level for child pornography offenses by at least two levels and include at least a two-level enhancement if a computer was used to transport the child pornography. The Commission complied, but expressed concern that the computer enhancement would apply broadly, and without any distinction between offenders who used a computer to widely disseminate child pornography and those who "email[ed] images to a single voluntary recipient." This Report to Congress also noted significant downward departure rates (for reasons other than

substantial assistance) for sentences imposed under the child pornography Guidelines: 23% under § 2G2.2 and 13% under § 2G2.4.

In 2003, Congress, apparently without seeking any input from the Commission, which, of course, it was not required to do, passed the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"), which resulted in several significant changes to the child pornography statutes and Guidelines, including "the first and only time to date [Congress] directly amended the guidelines." As the Second Circuit recently noted, the former United States Attorney for the Eastern District of New York described this statute as "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress."

The PROTECT Act added the "image table" to both § 2G2.2 and § 2G2.4 which raised the offense level based on the number of images at issue, ranging from a two-level increase for at least ten images to a five-level increase for 600 or more images. It additionally added to § 2G2.4 a four-level increase for material portraying sadistic or masochistic conduct or other depictions of violence (which the Commission included in § 2G2.2 in 1990). The Act also added a five-year mandatory minimum sentence for receipt and trafficking, and raised the statutory maximum from fifteen to twenty years for receipt and trafficking and from five to ten years for possession. The Act included general directives to the Commission to review the Guidelines, and in response, the Commission conducted several studies. The Commission concluded, for example, that the new amendments would more than double the average sentences under § 2G2.2 (from 42.8 months to 88.8 months) and nearly double the average sentences under § 2G2.4 (from 28 months to 54 months).

Effective November 1, 2004, the Commission again amended the Guidelines, consolidating § 2G2.4 into § 2G2.2. In response to the new minimum and maximum penalties set by Congress, the Commission set higher base offense levels for possession (increased from 15 to 18) and trafficking/distribution (increased from 17 to 22). The Report indicates that these offense levels were set below the mandatory minimum because "a majority of offenders sentenced under § 2G2.2 were subject to specific offense characteristics that increased their offense level." The Commission was "concerned that setting the base offense level any higher than 22 for trafficking and receipt offenses would affect the proportionality of other guidelines," and, could, for example, call for a higher penalty than that typically imposed on a defendant convicted of conspiracy to commit murder and kidnapping."

\* \* \* \* \*

We have recognized that a Guideline is likely to reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives *only when it is the product of empirical data and national experience, guided by a*

15

*professional staff with appropriate expertise.* (emphasis added)  In *Kimbrough*, the Supreme Court analyzed the crack cocaine Guidelines, and held that they were based on statutory mandatory minimum sentences rather than empirical data and national experience and, thus, the Commission had not exercised its "characteristic institutional role" in developing them.  A district court would not, therefore, abuse its discretion by concluding that a within-Guidelines sentence would not meet the sentencing purposes set out in § 3553(a), even in a typical case. . . . § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives."

*Id.* at 605. Internal citations omitted.


8.  **Sentencing Framework**


   A.  **Sentencing Judge's Role in Determining Appropriate Punishment**

   A high degree of discretion is possessed by the sentencing judge in determining appropriate

punishment. *See, e.g., United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A

sentencing judge has very wide latitude to decide the proper degree of punishment for an

individual offender and a particular crime."). It is the sentencing court that "is in the best position

to judge the appropriateness of a sentencing departure in light of the defendant's overall history

and character, his remorse or lack of it, and other factors bearing on the sentence to be imposed."

*United States v. Crowley*, 318 F.3d 401, 421 (2d Cir. 2003); *see also United States v. D.M.*, 942

F. Supp. 2d 327, 341 (E.D.N.Y. 2013).


   B.  **Section 3553(a) Factors**

   After consulting the Guidelines, a sentencing court performs an "individualized assessment"

of the situation. *Gall v. U.S.*, 552 U.S. 38 (2007).  This analysis is guided by "[r]easonableness"

and an "individualized application of the statutory sentencing factors" listed in section 3553(a) of

the United States Code, Title 18. *United States v. Dorvee,* 616 F.3d 174 (2d Cir.2010) (citing

*Gall,* 552 U.S. at 46-47); *Kimbrough v. United States,* 552 U.S. 85 (2007). As Justice Scalia

wrote in his concurring opinion in *Kimbrough,* a "district court is free to make its own

reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice

of the Guidelines."

In view of the excessive incarceration rates in the recent past and their unnecessary,

deleterious effects on individuals sentenced, society and our economy, justifiable frugality in

incarceration is prized. *See, e.g.,* Nat'l Res. Council of the Nat'l Academies, *The Growth of

Incarceration in the United States, Exploring Causes and Consequences,* 8 (2014) ("*Parsimony*:

the period of confinement should be sufficient but not greater than necessary to achieve the goals

of sentencing policy."). Pursuant to the "parsimony clause" in section 3553(a), a court is to

"impose a sentence sufficient, but not greater than necessary to comply with the specific

purposes set forth" at section 3553(a)(2). 18 U.S.C. § 3553(a); *see also Dorvee,* 616 F.3d at 182.

9. **Given the Nature and Circumstances of Mr. Elder's Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor one purpose of

sentencing over another," except that rehabilitation was not to be a reason to impose a sentence

of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes

should be considered in imposing sentence in a particular case," and "one purpose of sentencing

may have more bearing on the imposition of sentence in a particular case than another purpose

has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must consider" all of the

purposes and factors set forth in § 3553(a). *Id.* at 119. Here, all of the purposes of sentencing

point in the same direction. Mr. Elder's offense is less serious than the offenses Congress had in

17

mind and he is not the dangerous offender Congress envisioned. Mr. Elder's response to treatment, his strong family support, education and employment history point to a very low risk of further offending.

### A. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)

1. *Seriousness of the offense*

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[19]  Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.  Aside from the lack of evidence to support this belief in general, *see* 2012 Report to Congress: Federal Child Pornography Offenses, U.S. Sentencing Commission at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"),[20] the

---

[19] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

[20] A number of courts have rejected the notion that a defendant may be punished based on speculation that he might be a child molester. *See, e.g.*, *United States v. C.R.*, 792 F. Supp. 2d 343, 375-76 (E.D.N.Y. 2011); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009); *United States v. Johnson*, 588 F. Supp. 2d 997, 1005 (S.D. Iowa 2008); *see also* *United States v. Apodaca*, 641 F.3d 1077, 1087 (9th Cir. 2011) (Fletcher, J., concurring).

Government's own polygraph operator confirmed that Mr. Elder told the truth when he said he had not sexually abuse a child.

This distinguishes Mr. Elder from the offenders Congress had in mind and is therefore highly relevant. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober,* 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010). The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The opinions of Elder's treatment team and the forensic psychiatrist all say the same thing – that he presents no danger to children, is responding well to treatment, has insight into and remorse for his conduct, and is being rehabilitated.

### 2. *Just Punishment*

"[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements." Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015). In determining what further punishment to mete out, the Court should factor in Mr. Elder's pre and post sentencing liberty restrictions. Prior to sentencing, Mr. Elder has been compliant with court imposed electronic monitoring since January 26, 2016. Post sentencing, and in addition to any term of incarceration, Mr. Elder may be subjected to extended (up to lifetime) supervised release, potential electronic monitoring, prolonged and severe sex offender registration requirements under federal law and Pennsylvania law,[21] and loss of civil rights. Such post-release conditions represent exacting collateral consequences which serve to deter future criminal conduct. *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex crime statute "is not trivial");

### B.   Kinds of Sentences Available

The sentencing options available to the court include combinations of the following

---

[21] Under 42 PaCS 9799.14(b)(13) and 42 PaCS 9799.15(a)(1), Robert Elder will register as a sexual offender for 15 years.

variables: custody, electronic monitoring in home detention, a combination of custody and in home detention, followed by a seven year to life time term of supervised release; probation; restitution; forfeiture; and fines.   Mr. Elder suggests that the availability of sex offender treatment is of critical importance.

### C.   The Court Should Vary Below the Guideline Level Based Upon 2G2.2 Policy Disagreements

A sentencing court may sentence outside the suggested guideline range if it disagrees with a relevant policy reflected in the Guidelines. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (stating that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").   A district court's power to sentence based upon a policy disagreement is at its greatest when the Guideline is not the product of the Sentencing Commission's empirical analysis and technical expertise.   Congress established the Commission pursuant to the Sentencing Reform Act of 1984 ("SRA") "to formulate and constantly refine national sentencing standards." In fulfilling this "important institutional role," the Commission draws on a "capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise." When an offense guideline is based on the Commission's analysis of empirical data and national experience, the advisory ranges it produces can fairly be said to "reflect a rough approximation of sentences that might achieve [the] objectives" of Sentencing. "The Commission's expertise is primarily empirical, *see Kimbrough,* 552 U.S. at 109, 128 S.Ct. 558; and thus, when the Commission itself makes a policy decision for reasons that lie outside its expertise, the guideline that results might be vulnerable on precisely that ground." *United States v. Bistline*, 665 F.3d 758, 763–64 (6th Cir. 2012).

"Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient." *U.S. v. R.V.*, Statement of Reasons for Sentencing Pursuant to 18 U.S.C. § 3553(c)(2), p.1, Judge Jack Weinstein, EDNY 2016. "The [child pornography] guidelines have lost the respect of a large number of judges across districts."[22] See Notice of Proposed Priorities and Request for Public Comment, July 29, 2014. Guideline "§ 2G2.2 is "fundamentally different" from other Guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Gorber* at 607.

A strong judge-initiated trend of policy based downward variances in child pornography offenses has emerged in recent years. These judges have articulated principled, statistic-driven deconstructions of 2G2.2, which find support in the Sentencing Commission's own findings. In 2012, the United States Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (2012).[23] The Commission explained that it compiled the report pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges that is reflected in their sentencing decisions, *Id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguish among offenders based on their degrees of culpability." *Id.* at ii, 323.

---

[22] See report at:
http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20140729/DOJ.pdf
[23] The report is available at:
http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm

In a recent study, seventy percent of district court judges believed that the guideline range for possession of child pornography is too severe. *See* United States Sentencing Commission, *Results of Survey of United States District Judges,* Tbl. 8 (2010).[24]  Sentencing statistics from the United States Sentencing Commission are consistent with that finding. In 2015, there were 1903 individuals sentenced pursuant to USSG § 2G2.2. United States Sentencing Commission, *2015 Sourcebook of Federal Sentencing Statistics*.[25] Of those individuals, 1,294 or 68% received below guideline sentences (of which only 62, or 3.3%, resulted from substantial assistance).

The Commission found that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *See* United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (2012) at iii, xi; *id.* at 209, 323.  It explained that "technological  changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *Id.* at xi, the "current guidelines does not adequately distinguish among offenders regarding their culpability for their collecting behaviors, *Id.* at 323.   The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

---

[24] The report is available at:
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf
[25] Table 27, attached as Exhibit N.

In practice, these enhancements are so routinely applied that they have become intrinsic to the crime itself. [26] The two-point computer enhancement is present in 94.4 percent of cases. The proliferation of internet images has led to the four-level increase for possessing more than 600 images being applied in 82.6 percent of the cases. The two-level increase for children under 12 is applied in 94.5 percent of the cases and the five-level increase for violent content increase applied in 73.4 percent of the cases.

The Sentencing Commission opposes many of the changes to the Guidelines directed by Congress and is seeking authority to amend the current child pornography provisions. U.S. Sentencing Commission, *Federal Child Pornography Offenses*, at 322 ( "[T]he Commission believes that Congress should enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines.")

The table below illustrates the effect of the Guideline changes over time on Mr. Elder's sentencing range:

| Guidelines Promulgation 1987 | Child pornography possession not a crime | |
|---|---|---|
| 1991 –First CP Possession Guideline § 2G2.4 | 10 | Base Offense Level |
| | 2 | Minor under 12 |
| | -2 | Acceptance of responsibility |
| | **10** | **6-12 months** |

---

[26] Exhibit table *Specific Offense Characteristics; Fiscal Year 2015,* attached as Exhibit O.

| 1991 Amendments<br>§ 2G2.4 | 13 | Base Offense Level |
| | 2 | Minor under 12 |
| | 2 | 10 or more items |
| | -2 | Acceptance of responsibility |
| | **15** | **18-24 months** |
| 1996 Amendments<br>§ 2G2.4 | 15 | Base Offense Level |
| | 2 | Minor under 12 |
| | 2 | 10 or more items |
| | 2 | Possession as a result of computer use |
| | -3 | Acceptance of responsibility |
| | **18** | **27-33 months** |
| 2003 Amendments<br>§ 2G2.4 | 15 | Base Offense Level |
| | 2 | Minor under 12 |
| | 2 | 10 or more items |
| | 4 | Sadistic or masochistic conduct |
| | 2 | Possession as a result of computer use |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **27** | **70-87 months** |
| 2004 Amendments<br>§ 2G2.2 | 18 | Base Offense Level |
| | 2 | Prepubescent minor |
| | 4 | Sadistic or masochistic conduct |
| | 2 | Possession as a result of computer use |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **28** | **78 -97 months** |

The table is instructive because it can serve as a foundation upon which to tether an adjusted guideline range based solely upon Commission empiricism and data. Moreover, using solely the levels promulgated pursuant to the Commission's typical process (designed to reflect the goals of sentencing), Mr. Elder's guideline range would be computed as follows:  18 base offense level; 2 for prepubescent minors, minus 3 for acceptance of responsibility, for a total offense level of 17, yielding a guideline of 24-30 months.

## D.     Unwarranted Sentence Disparities

In a case remarkably similar to this one, including an identical guideline range, the sentencing court determined that a "sentence of time-served of five days, seven years of strict supervised release with sex offender treatment, a $12,500 fine in addition to $2,000 in victim's restitution and a $100 special assessment, coupled with the continuing sex offender notification and registration requirements as provided by statute under 42 U.S.C. § 16913, amounted to appropriate punishment, for the reasons set forth herewith." *United States v. R.V.*, 157 F. Supp. 3d 207, 258 (E.D.N.Y. 2016). The citations listed below are lifted from that court's January 21, 2016, Statement of Reasons for Sentencing Pursuant to 18 U.S.C. § 3553(c)(2):

> In departing downward, district judges nationwide have spoken out against the harsh Guidelines sentences for child pornography offenders. *See, e.g., United States v. Kelly,* 868 F.Supp.2d 1202, 1211 (D.N.M.2012) (defendant received and downloaded 580 images of child pornography; "[Defendant]'s advisory Guideline sentence of 87 to 108 months imprisonment is far greater than necessary to punish and deter his conduct and protect the public. This is largely due to serious flaws in U.S.S.G. § 2G2.2, which was not drafted pursuant to the Sentencing Commission's usual expertise, and all too frequently generates unjustly excessive terms of incarceration."); *United States v. Marshall,* 870 F.Supp.2d 489, 491–92 (N.D.Ohio 2012) ("Under the Guidelines, some of the recommended sentences for viewers can, with enhancements, be higher than those for actual predators.... In effect, the Guidelines presume that those who view child pornography are indistinguishable from those who actually abuse children."); *United States v. Stark,* No. 10–CR–270, 2011 WL 555437, at *7 (D.Neb. Feb. 8, 2011) (defendant downloaded over 100 image files, and had multiple hard drives containing over 2,000 images, 5,000 videos, and 650,000 images of child erotica; "[T]he child pornography Guidelines are driven by Congressional directive and are not grounded in any scientific, statistical, or empirical method.... Although downloading child pornography is hardly a harmless activity, it is not the equivalent of direct physical abuse or sexual molestation of children, or production of pornography involving children. The court finds that the ranges of imprisonment recommended under the Guidelines may be appropriate for a sexual predator, but are not a reliable appraisal of a fair sentence in this case."); *United States v. Price,* No. 09–CR–30107, 2012 WL 966971, at *12 (C.D.Ill. Mar. 21, 2012) (images of defendant's daughter along with 937 still images and 21 videos of other children alleged to be child pornography where found on defendant's computer; "[C]hild pornography crimes fall within a spectrum.... This Court finds

that a below-Guideline sentence is needed in this case in order to avoid unwarranted sentencing disparities but also to avoid unwarranted sentencing similarities among defendants convicted of dissimilar conduct."); *United States v. Cameron,* No. 09–CR–00024, 2011 WL 890502, at 4 (D.Me. Mar. 11, 2011) ("[Defendant] is subject to nearly a ten-fold greater punishment for possessing images of someone else sexually abusing a minor than he would receive if he had committed the actual abuse himself."); *United States v. Beiermann,* 599 F.Supp.2d 1087, 1105 (N.D.Iowa 2009) (defendant pled guilty to knowingly transporting, receiving, and possessing child pornography across state lines, in total 2,600 images of potentially 370 different victims; "This guideline, thus, blurs logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment.... The sentencing court must consider the need to avoid *unwarranted similarities* among defendants who are *not* similarly situated, as well as *unwarranted disparities* among defendants who *are* similarly situated."); *United States v. Cruikshank,* 667 F.Supp.2d 697, 702 (S.D.W.Va.2009) (defendant convicted of possessing or knowingly accessing with intent to view child pornography; "There is nothing redeeming or even understandable about this crime. But judges must objectively consider whether the sentences imposed further the goals of punishment. To do so, we must differentiate between those who create child pornography and those who consume it.... In an instance of troubling irony, an individual who, sitting alone, obtained images of sexually exploited children on his computer, could receive a higher sentence than the Guidelines would recommend for an offender who actually rapes a child."); *United States v. Burns,* No. 07–CR–556, 2009 WL 3617448, at 7–8 (N.D.Ill. Oct. 27, 2009) (defendant was convicted on two counts of receiving and distributing child pornography with a "relatively small collection of illegal images"; sentenced to 72 months, below Guidelines' range of 235–293 months); *United States v. Meysenburg,* No. 08–CR–361, 2009 WL 2948554, at *8 (D.Neb. Sept. 11, 2009) ("Possession of pornography is the least serious of the crimes on the continuum of conduct—from possession to distribution to production to predatory abuse—that exploit children. One who possesses child pornography is considerably less culpable than one who produces or distributes the exploitative materials and a possessor is a marginal player in the overall child exploitation scheme."); *United States v. Johnson,* 588 F.Supp.2d 997, 1004–07 (S.D.Iowa 2008) (refusing to "give too much weight to the sentencing guidelines, given their lack of empirical support" and finding that a sentence well below the Guidelines range was warranted); *United States v. Grober,* 595 F.Supp.2d 382, 393 (D.N.J.2008), *aff'd,* 624 F.3d 592 (3d Cir.2010) (defendant convicted of downloading 1500 images and 200 videos of child pornography; "§ 2G2.2 leads to a sentence that is too severe in a downloading case. Surely congress did not intend to provide a sentencing range of 19½ to 20 years for a typical downloader, especially one who pleads guilty. Aside from overly punitive sanctions for a first offender, the guidelines sentence for a typical downloader squelches the ability of a judge to depart upward. The bottom line is that the skewed focus in § 2G2.2 on content and the strained application to conduct ... lead to a vision whereby the predator becomes indistinguishable from the voyeur.").

**United States v. R.V.**, 157 F. Supp. 3d 207, 262–64 (E.D.N.Y. 2016)

Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography (as opposed to distribution, production and actual sexual abuse). With respect to defendants convicted only of possession offenses, some courts have imposed sentences with minimal or no incarceration. *See, e.g., D.M.,* 942 F.Supp.2d at 352; *United States v. Autery,* 555 F.3d 864, 867 (9th Cir.2009) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Stall,* 581 F.3d 276, 277–78 (6th Cir.2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); *United States v. Prisel,* 316 Fed.Appx. 377, 378 (6th Cir.2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *United States v. Rowan,* 530 F.3d 379, 380 (5th Cir.2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito,* 215 Fed.Appx. 354, 355 (5th Cir.2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography); *United States v. Crespo–Rios,* No. 08–CR–208, 2015 WL 6394256, *1 (D.P.R., Oct. 19, 2015) (holding "that resentencing Defendant to the same sentence—that is, time served followed by a long period of supervised release—is justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553"); *United States v. Mallatt,* No. 13–CR–3005, 2013 WL 6196946, at *13 (D.Neb. Nov. 27, 2013) ("sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing in this case"); *United States v. Diaz,* 720 F.Supp.2d 1039, 1048 (E.D.Wis.2010) (imposing non-Guidelines sentence of six months of incarceration followed by twelve years' supervised release); *United States v. Meillier,* 650 F.Supp.2d 887, 887 (D.Minn.2009) (imposing non-Guidelines sentence of one day of *265 confinement followed by thirty years of supervised release); *United States v. Boyden,* No. 06–CR–20243, 2007 WL 1725402, at *10 (E.D.Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility); Judgment in a Criminal Case, *United States v. Evren,* No. 10–CR–131 (E.D.N.Y. Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years of probation for defendant who pleaded guilty to one count of possession of child pornography); *see also United States v. Morace,* 594 F.3d 340, 351 n. 10 (4th Cir.2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

*United States v. R.V.,* 157 F. Supp. 3d 207, 264–65 (E.D.N.Y. 2016)

**Conclusion**

28

It is surely folly that 2G2.2's total offense level for a consumer only, is the same or greater than a violent carjacking resulting in injury or more harshly than a repeat offender distributing multiple pounds of heroin. "One of the foundational rules of our criminal justice system is that punishment should be commensurate with the crime—its threat to society. The need to tailor sentences to the dangers and needs of the individual being sentenced (and his family and community) are also foundational. Proportionality in sentencing encourages a fair system. Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient." *United States v. R.V.*, 157 F. Supp. 3d 207, 209–10 (E.D.N.Y. 2016).

The ground beneath Guideline 2G2.2 is crumbling. As the late Justice Scalia commented," I have acquired new wisdom ...or, to put it more critically, have discarded old ignorance."[27] In *Gorber*, our Circuit Court "discarded [the] old ignorance" quoting the Second Circuit's conclusion that 2G2.2 was an "eccentric Guideline of highly unusual provenance" and "is not worthy of the weight afforded to other Guidelines." *United States v. Grober*, 624 F.3d 592, 607–08 (3d Cir. 2010).[28] Sentencing judges, marshalling ever lengthening string citations reflecting their like-minded brethren's decisions and the Sentencing Commission's powerful data and empirical evidence, have given voice to "new wisdom" by crafting sentences that do no violence to the purposes of sentencing. Nationwide, it is far more likely than not that a judge

---

[27] Justice Scalia's concurrence in *Ring v. Arizona*, 536 U.S. 584, 611, 122 S. Ct. 2428, 2444 (2002)

[28] *See also United States v. Stone,* 575 F.3d 83, 97 (1st Cir.2009) ("[W]e wish to express our view that [§ 2G2.2 is] in our judgment harsher than necessary.... [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like.").

will sentence a defendant like Mr. Elder to a below guideline sentence.

There is strong policy and precedential support for sentencing Mr. Elder well below the guidelines – building on his current treatment successes, and emphasizing in home detention and supervised release over extended incarceration. Mr. Elder respectfully requests the Court craft a sentence that emphasizes extended in home detention with electronic monitoring, employment and continuing in treatment over prison warehousing. To the extent incarceration is unavoidable, it should be for no longer than is reasonably necessary for Mr. Elder to avail himself of the BOP's – out-patient sex offender treatment which generally takes 9-12 months, exclusive of the classification process.

September 9, 2016

/s/ Andrew J. Shubin
Andrew J. Shubin, Esquire
Pa. Attorney ID #63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@statecollegelaw.com

*Attorney for Defendant,*
*Robert Elder*



United States Postal Inspection Service

Polygraph Examiner System

**Restricted Information**

**Report Name:** US Postal Inspection Service Polygraph Examination for Polygraph File Number 4573-2014-1218

### Requester Information

**Date of Request:** 07/23/2014

**Inspector:** KAREN E YOAKUM

**Case Number:** 2045021-PMCE

**Zip Code of Exam Office:** 16823

**WRN:** 6353

**Division Code:** 220

### Examiner Information

**Examiner:** KEVIN F BOYLE

**Exam Monitored?** No

**WRN:** 4573

**Monitor Name:** N/A

### Examinee Information

**Subject Name:** Robert J Elder

**Exam Date:** 08/06/2014

**DOB:** 08/24/1976

**Postal Employee?** No

### Examination Results

No Deception Indicated

### Description of Case

A search warrant was executed on August 6, 2014 at the residence of Operation Durak suspect Robert Elder in Bellefonte, PA. During the initial interview, Elder admitted to ordering approximtely $6,916 in suspected child pornography via the US Mail from a commercial distributor in Canada. Elder agreed to submit to a polygraph examination on this date. The polygraph examination is being requested to examine whether Elder is being truthful when he denied ever engaging in a sexual act with anyone under the age of 18 during the past 15 years. This examination will take place at the Pennsylvania State Police office in Bellefonte, PA.

### Remarks

It should be noted, during the pre-test portion of this examination, Elder stated he "ripped" off the underwear of a 12 year old boy back in 2000. According to Elder, he met this boy through his church and would occasionally babysit him. At the time of the above incident, Elder was approximately 23 years old and stated he did this as a joke. Elder stated he also read to this same boy while he (boy) was bathing in the bath tub. Elder reported he dried this boy off with a towel before they both went downstairs and watched movies together at this boy's residence. Elder vehemently denied ever sexually molesting this boy or anyone else. After obtaining this information, Elder was administered a polygraph examination. This examination concentrated on the previous 15 years of Elder's life and whether he ever engaged in or participated in a sex act with anyone under the age of 18. An analysis of the physiological responses on the polygraph charts of Robert J Elder did not indicate deception. It is the opinion of this examiner that he was being truthful when he denied ever engaging in a sex act with anyone under the age of 18 during the past 15 years.

Print Date / Time: 8/6/2014  6:24:08PM



EXHIBIT

A



United States Postal Inspection Service

Polygraph Examiner System

**Restricted Information**

Report Name: US Postal Inspection Service Polygraph Examination for Polygraph File Number 4573-2014-1218

**KEVIN F BOYLE, Examiner**
(Signature Required)

1144 Zion Ridge Avenue
Bellefonte, PA 16823
September 8, 2016

Honorable Matthew Brann
Herman T. Schneebeli Federal Bld & US Courthouse
240 West Third Street
Williamsport, PA 17701

Dear Honorable Brann:

My name is Sharon Elder and I am the mother of Robert Elder.  I have been employed by The Pennsylvania State University since May 1997.  I am currently the Administrative Staff Assistant for the Department Head in Computer Science and Engineering.

Like most mothers, my greatest desire was for Robert to grow to a fine man and contribute to society. I tried to instill a good work ethic, be respectable and do for others. When he was growing up, he was not interested in sports, scouting or the usual pastimes accustomed to people of his age. Instead, he opted to frequently spend weekends and holidays with his maternal grandmother. He would accompany her to bingo, working at the local friendship center, playing board games or watching TV. He continued to visit and spend free time with her until he was in his thirties, when she moved to Florida to be cared for by her daughter.

I will say at the onset that I do not condone Robert's actions that led to this investigation but I know he is deeply sorry.  I have closely watched him since the postal inspection investigation and see many changes to his lifestyle.  He has taken many steps to correct his actions and regularly sees two different psychologists in an effort to find help as quickly as possible.  We have seen a positive change in Robert's outlook since he began counseling and was finally able to talk about his pain, isolation and the urges that haunt him.

Despite working under very difficult circumstances and being abandoned by people he perceived as being supportive, he still has a genuine interest in caring for people. He maintains contact with several of the elderly people he has helped with various tasks or regularly visited.  He frequently asks us to check on someone, if he is not able to reach them by phone.

Robert has always been very much a loner and that trait became even more pronounced as he grew older. For some reason he became consumed and even addicted to the purchasing and hoarding of goods whether the item was necessary, a duplication of one already in his possession or useful. Many of these items remain unopened, given to someone, stored at another person's house, packed in tool boxes, or cast on a never ending pile. The excessive buying of the pornographic materials is just one aspect of the unnecessary purchasing. He wrongly chose to use the ease of buying though the Internet to feed this desire and the effortlessness to pay by credit card thus amassing a huge credit card debt, despite our urging that he receive professional help.

Robert is our only child and I recognize how deeply a prison sentence will affect our whole family unit. We are getting to the point in life where we need help with many duties around the home and would greatly appreciate your consideration.


EXHIBIT
B
tabbies

Thank you for taking the time to read my letter.

Sincerely,

Sharon L. Elder

1144 Zion Ridge Avenue
Bellefonte, PA 16823

September 8, 2016

Honorable Matthew Brann
Herman T. Schneebeli Federal Bld & US Courthouse
240 West Third Street
Williamsport, PA 17701

Dear Honorable Brann:

I am the father of Robert Elder.  My name is William (Bill) Elder.  I recently finished my work as I worked at Dix Honda Company selling cars for 33 years.  I am now working around the house and helping some other people.

As father of Robert, I was really hurt over this incident.  I love my son and will be supportive of him.  I know he has a tough road ahead and my hope is that he keeps positive with all he will have to face.

As Robert was growing up, he seemed to want to be alone and he had a hard time making friends.  He was a shy person and didn't want to participate in many activities.  He did do well in school and we didn't have any problems with him.  He is a hard working and does help other people, especially some of the elderly.

He has done a good job of following all the restrictions and guidelines.  He does not try to do any thing that would be detrimental to his conditions.  He goes to work at Pro Build which he has worked there for a little over 3 years and comes directly home.  I think this is helping him be more regimented.

I know Robert knows right from wrong and he made a terrible mistake. He definitely knows it was wrong what he did.  I don't know exactly what is going to happen, but my hope is that he will be able to get through this.  I know he is a trustworthy person and would not be a harm to anybody, but would be more of someone who would be a help to them.

Thank you for taking the time to read this.

Sincerely,

William D. Elder



Troy Trude

823 Sportsmans Rd

Morrisdale, PA

General manager of PROBUILD, INC from 1992 to April 18, 2016.
Currently holding the same position at Ciesco, Inc. I am 51 years old.

In April 2013 I hired Robert Elder in the labour position. In the time
since, Robert has become one of the delivery drivers for PROBUILD. He
has always been a very reliable employee, always very punctual, does
whatever he can do to complete all work assignments, working long
hours and always willing to work extra if asked. He also gets along well
with other employees and with the customers at the jobsites. In the
time I have known Robert, he has shown to be very dependable, loyal
and willing to give others a helping hand. If a position with the Ciesco
company would become available, I would not hesitate offering Robert
a job.

Thank You,

Troy Trude

*Troy D. Trude*

EXHIBIT

D

tabbies

1223 Sylvan Circle
Bellefonte, Pa. 16823
August 18, 2016

Honorable Matthew Brann
Herman T. Schneebeli Federal Bldg. & Courthouse
240 West Third Street, Suite 218
Williamsport, Pa.17701

Dear Judge Brann :

My name is Dorothy J. Davidson.  I have worked as a legal secretary and office manager for
Miller, Kistler and Campbell, Attorneys at Law,  for the past 52 years and in fact, am still employed there
part time doing estate work.  I am Robert's aunt, and have known him from day one.  As my sister's son,
I have had the pleasure of watching Robert grow up and over these years, he has consistently spent
much time at my house and with my late husband,  Richard M. Davidson.

Throughout our relationship, I had always noticed the friendly and benevolent nature in which
he would interact with other family members and friends.  He is honest, has never been in trouble
before and is always willing to lend a helping hand to family and friends in need.  Personally, I can speak
to the countless hours Robert spent with my husband at our home.  He helped us with yard work, small
building projects and heavy lifting on numerous occasions and his presence was always welcome.

Our neighbor, Angelina Holden, is an elderly widow with no family that currently lives in the
United States.  Robert has spent countless hours helping her around the house (cleaning, painting and
home improvement jobs); most of which he did in his spare time free of charge.  This same neighbor had
a bad fall from which she sustained a broken neck and numerous contusions.  Robert was the first
person she called for help, and he was instrumental in her transport to the hospital for emergency
treatment and care.  When she was discharged from the hospital, Mrs. Holden was placed in the care of
Centre Crest Nursing Home where Robert visited her frequently until she was able to return home.  I
believe that this specific instance speaks to the compassion and consideration that Robert shows all of
his friends and family.

After Robert graduated from college, he had a hard time acquiring full time employment.  He
worked for a number of years at seasonal jobs, until he found a full time position with benefits.  I know
he has been charged with a violation of the law, but I do not feel his sentence would be best served in
prison.  He is a kind and hard working individual who I believe is an attribute to society.  Robert made a
mistake for which he is truly sorry: a sentiment that he has personally shared with me on many



EXHIBIT
E
tabbies

occasions throughout the past months.  From my conversations with Roberts, I have come to believe that this was truly a onetime mistake due to frivolous curiosity and ignorance.  I am confident that now he knows better.

Very truly yours,

Dorothy J. Davidson

Sylvan Circle
Bellefonte, PA 16823

August 2, 2016

Honorable Matthew Brann
Herman T. Schneebeli Federal Bld & US Courthouse
240 West Third Street
Williamsport, PA 17701

Dear Honorable Brann:

My name is Angelina Holden and I am retired from Pattee and Paterno Library at The Pennsylvania State University. I have known Robert Elder and his parents since he was a small child. I came to know him very well during the past ten years as he has been a great help to me in completing many of the tasks around my house. My husband died many years ago so it was so great to have someone I could depend on to do various tasks. It did not matter whether the weather was very hot or very cold, when a favor was asked he was more than willing to help. He also checked on me when I did not ask just to make sure I was ok. If I needed taken to the store for groceries or other items, he very willingly made this happen.

Robert is quiet and hesitant to be around large crowds and pretty much keeps to himself but always made time to help me. He would pick me up and take me to places such as outdoor cookouts, special meals, breakfast on a weekend and local events. I very much looked forward to him spending time with me as his patience and kindness was very important. I am originally from Mexico and I do not have any family members living in the US so having someone that I am comfortable asking to do things is quite limited.

When Robert was put under investigation in 2014, he was very honest and open in telling me. He is extremely sorry for his actions. Even through all the difficult times, Robert has still continued to contact me and worry that I was fine. I know that Robert has made a huge mistake, but I still value his thoughtfulness, generosity and concern.

Sincerely,

*Angelina Holden*

Angelina Holden

EXHIBIT
F
tabbies

Thomas L. Davidson
102 Rosewood Cove
Bellefonte, PA, 16823

Honorable Matthew Brann
Herman T. Schneebeli Federal Bldg. & U.S. Courthouse,
240 West Third Street
Suite 218
Williamsport, PA 17701

Dear Judge Brann,

My name is Thomas (Tom) Davidson and I am writing this letter in regards to my first cousin
Robert Elder.  Currently I am employed as a senior Database Administrator at Penn State University in
the Administrative Information Services department.  I have a Master of Science degree in Management
Information Systems from Pennsylvania State University and throughout my 30+ year career I have
worked various IT and management positions with IBM and Microsoft.

I am the oldest of the grandchildren in our family.  Robert is one of the youngest and thus, I
have had the opportunity to observe Robert Elder throughout his entire life.  I spent time with Robert
during family functions and reunions, get-togethers at the family farm and most frequently during visits
with his parents, my aunt Sharon and Uncle Bill.  Robert always looked forward to family functions and
get-togethers.

Early on, Robert developed interests and skills in farming and agriculture from his grandfather,
car mechanics from his Uncle Ron and gardening and house projects/home construction from my father,
Richard.  With these skills, Robert not only works but *helps.* He is always ready and willing to lend a hand
to our family and friends which I experienced firsthand as he helped me move our family from New
Jersey to Pennsylvania.

Over the years the strongest impression I have of Robert is of his generous and tireless service
and support of family members and friends alike.   From garden, yard and construction projects, to odd
jobs for elderly neighbors, Robert has generously volunteered his time and efforts to help family and
friends in innumerable ways.

Robert typically juggled a number of side projects outside of full-time work (such as constructing
patios using pavers).  For the big projects, he would put together work crews consisting of co-workers
and friends.  I have been a part of his work crew on many occasions.  Often the first to arrive, Robert is
frequently the last to leave.

Robert is thoughtful, gentle and kind.  He would regularly take the elderly neighbor out
shopping and helps with odd jobs around her house.  He would frequently visit our house (every week
or so), and often had dinner with the family.  He would talk at length about his various work projects
and friends.



EXHIBIT

G

tabbies®

Robert has expressed to me multiple times that he is truly sorry for the mistake he has made. My opinion is that Robert is basically a trustworthy kid who made a big mistake. He has had a positive impact on many people. Robert has been a productive member of society for as long as I have known him, and has never been in any trouble before this. I don't believe incarceration would be productive for Robert or society as a whole. My hope and belief is that Robert can continue, with counseling, to be a productive member of society.

Sincerely,

Thomas Davidson

August 23, 2016

320 Turnpike Street
Milesburg, PA 16853


August 20, 2016

Honorable Matthew Brann
Herman T. Schneebeli Federal Bld & US Courthouse
240 West Third Street
Williamsport, PA 17701


Dear Honorable Brann:

My name is Dorothy Engleman and I am writing on behalf of my husband and I to tell you about Robert Elder.  My husband is self-employed in a  painting business and I assist in this business. I have known Robert since we were in the same grade at the Bellefonte Area Middle School.   I recall Robert as being quiet and a loner much like myself. He did not get into trouble and the teachers liked him. I became reacquainted with him several years ago when we moved to our present home and he helped while we got settled. He also became friends with both my husband and I. He was very willing to lend a helping hand with anything we asked. We could count on him to do any type of labor, assist if Harold needed an extra hand, or should Robert have the tool or machine to get the job done,  he would willingly loan it to us. It was not only by assisting in work related projects we also enjoyed having him as our friend. He has always been welcome at our home. He frequently stopped by just talk and visit. I enjoyed our visits and being able to talk with someone that was in school with me as we went through the same types of feelings of loneliness and not having many school friends. Robert is very trusting and helpful and thought everyone had the same giving character, even when cautioned that the person he was dealing with was not.  He interacted very well with my whole family, including my two daughters, who are twelve and thirteen.   We liked having him around so much that we included him in several of our meals including Christmas dinner.

Robert has made a great mistake and I know how difficult it was for him to tell Harold and I about it. Once again, I admire his honesty in coming forth and talking with us.  I know he is now receiving counseling to understand why he acted in the manner he did.  For my family, we still think very highly of him and know what a good friend and helper he is to our entire family. We feel Robert deserves a second chance in society.

If you have any questions, please feel free to contact me at 814-355-2872 or Harold's cell phone at 814-876-2091.


Sincerely,

Dorothy and Harold Engleman



EXHIBIT
H

Richard D Greninger
671 Bellefonte Ave
Lock Haven, PA 17745

Honorable Matthew Brann
Herman T. Schneebeli Federal Bldg and Courthouse
240 West Third Street, Suite 218
Williamsport, PA 17701

August 15, 2016

Dear Sir:

My name is Richard D Greninger, and I live in Lock Haven. I was a math teacher for 38 years in Keystone Central School District. I have known Robert Elder for approximately 20 years, and I knew him a couple of years before I retired in 1999. I met Robert at his uncle's garage, for his uncle Ron Askey, was a mechanic and did a lot of different work on cars, trucks, and tractors.

Ron would show Robert how to fix a lot of different things in the garage. Robert would work on a lot of things in the garage, and he would help clean and organize Ron's tools. Robert got some shelves and put them in the garage as well as some tool boxes and his own tools that Ron could use if needed. Robert was not lazy, for he would jump right in and help without being asked.

Robert would bring trees in for his uncle to burn in the furnace. He just plain liked to help anyone, and he would help me move some van seats that were heavy on the second floor of Ron's garage. Robert's uncle Ron was a very good influence on him.

I always felt very good when I was around Robert. I think he was and is very trustworthy. Robert, Ron, and I would go to get lunch together when I was at the garage. I do not see Ron or Robert as much anymore since Ron closed his garage and moved to Warren, PA, but Ron does stop at my house when he comes to Lock Haven. When his uncle Ron got hurt in an accident at home in Warren, Robert would call and tell me how Ron was doing.

I always thought Robert was very nice and kind, for I do not know many people that would jump right in and help with the type of dirty work like putting insula in a ceiling that came loose and down in which it was full of dirt and got all over you.

**EXHIBIT I**

Robert came from a very good family and got a good education, and I thought it would be nice if he could have gotten a teaching job. Things just did not work out that way for him. Robert is not a bad person at all, and I think he just made a poor judgement.

I do not feel different about Robert as a person, other than I wish the problem did not exist. Knowing what happend to Robert, I would not feel strange around him. I had a lot of kids in school that got into serious crimes after they got of school, and some of them with robbery, car theft, child abuse, and with drugs and murder. Robert is not even close to those type of people. As a teacher I had to deal with over 6000 kids for math, and I was around another 10,000 or more other kids. I feel I have a pretty good judgement about people, and I can be very understanding of people.

My feeling about Robert is that he should not get or be in prison, for he is not that type of person. I think he needs to get a scolding and maybe some counseling but not prison. I talked to Robert on the phone about a month ago, and the feeling that I got out of our conversation was that he made very poor judgement and was sorry for it. This should not have happened to Robert, but it did.

Of all the people that would go into the garage, I do not know of anyone that did not like Robert, and I hope everything turns out well for Robert.

Very truly Yours
Richard D Greninger

**JOSEPH S. SILVERMAN, MD**
**4304 LYNNDALE ROAD**
**ALTOONA, PA 16602**
PHONE (814) 943-6609
FAX (814) 943-5219
E-MAIL jsspks@atlanticbb.net

June 8, 2016

Andrew J. Shubin, Esquire
333 South Allen Street
State College, PA 16801

IN RE:                          Robert Jason Elder
DATE OF BIRTH:                  August 24, 1976
ADDRESS:                        1144 Zion Ridge Avenue, Bellefonte, PA  16823
DATE OF EXAMINATION:            June 8, 2016
PLACE OF EXAMINATION:           3701 Burgoon Road, Altoona, PA  16602 (examiner's consulting
                                room)

Dear Attorney Shubin:

On June 8, Robert J. Elder was interviewed at my office.  Your referral is very much appreciated.  Currently on probation, your client needed to get permission from his probation officer to leave home and come to this appointment.

**REASON FOR EXAMINATION:**     Mr. Elder has pled guilty to charges involving the possession of "pornographic materials."  You were interested in your client's psychological makeup and how that might affect his behavior in the future.

**SOURCES OF INFORMATION:**

1. Interview with the defendant, 2 hours.
2. Memorandum of interview by Pennsylvania State Police inspectors, August 6, 2014.
3. Pre-sentence Investigation Report by John K. Vought, Officer in Charge, April 11, 2016.
4. Impact statements from victims of specific videotapes.
5. Summary of professional contact by John R. Erickson, PhD, psychologist, June 7, 2016.
6. *Bellefonte Man Charged with Possession of Child Pornography*, Department of Justice, US Attorney's Office, Middle District of Pennsylvania, January 5, 2016.
7. Telephone interview with parents, June 9, 2016.

**IDENTIFICATION:**     Mr. Elder has been a deliveryman for ProBuild, a supplier of building materials – drywall, insulation, metal studs.  Mr. Elder has recently been accredited for a CDL license.  Although this is not required for his current work, it may qualify him for certain advanced duties in the future.  His past jobs have included meat packing, auto parts department clerking, carpet cleaning, and landscaping.

Robert is a graduate of Lock Haven University.  His major was elementary education, but your client, averse to dealing with parents of prospective elementary school students, therefore sought other kinds of employment.

Mr. Elder has always resided with his parents.  Father, 65, is a former automobile salesperson.  The three family members typically attend different conservative Prote_ churches.  Your client not only has never married, he has never dated.

**EXHIBIT**
**J**
tabbies

Page 2
IN RE:   Robert Jason Elder

**DESCRIPTION OF INTERVIEW:**     Mr. Elder arrived 10 minutes early for his appointment. He is now a bit larger than his usual 190 pounds, registering an additional 20 pounds on his 5-foot, 8-inch frame.  He has found that he has a tendency to eat more while under the stress of his two-year legal situation, which dates back to a federal raid on his residence in August 2014.

**EXAMINATION:**     In telephone contacts with the examiner prior to this interview, the subject was terse, and his voice sounded flat.  These characteristics were not as prominent in person.

Wearing glasses and a beard, eyelids repeatedly squinting tic-like, Mr. Elder was comfortable enough to express his deeply-felt convictions about various aspects of American society.  Mr. Elder draws much displeasure from the world around him.  He was critical of employees of Pennsylvania State University (seen as poorly motivated for their jobs), main campus Penn State math education, the indifference toward him of acquaintances in different settings.  He was indignant that children as young as 5 or 6 are now allowed to take on the identity of the opposite sex if uncomfortable with their biological gender assignment.

He was most positive about his co-workers at ProBuild, although even there his relationships are relatively superficial.  He finds work to be a valuable distraction from "the feeling that life is sucky."

Uncomfortable in large crowds, the subject may have an unrecognized crowd phobia, in fact.  Robert made no bones about his anxiety and misery, which he views as lifelong but certainly exacerbated by his arrest in 2015.  "I want to stay in my bedroom. When my mother has guests, I don't want to associate with them. I'm ready to be gone."  If beset with a malignancy, he would reject treatment and leave the outcome to God.

In his present somber state, Robert lacks the ambition to help with housework.  He lives in fear that a policeman may pull him off the road and give him a ticket, creating a violation of his probationary duty to obey all laws.  He does not have his usual enthusiasm for looking at antique farm tractors.  His present life goal he expresses as "to avoid hell."

*Past Personal History:*     Robert's worst days, prior to his arrest, were those he spent as a student at Penn State.  During the latter interval, Mr. Elder, during his year and a half on campus, plunged into depression and suicidal planning.  Self-execution as a result of carbon monoxide was the contemplated mode of exit.

*Substance Use History:*     Mr. Elder has never employed street drugs.  He consumes alcohol sparingly, utilizing beer "for medicinal purposes" when he has a sore throat.  He does not use tobacco and is strongly avoidant of its odor and smoke.

*Social Relations:*     Robert has always been a loner.  His parents have described him that way in discussions with investigators.  He tends to feel that as a well-meaning person he has been taken advantage of by people with predatory instincts.  Mr. Elder estimates that only 1 in 100 persons is "decent."  He has found it difficult to make friends.  "I have bent over backwards for people."  After high school he made great efforts to be tactful and polite to other people.  This strategy was not rewarded and therefore was ultimately discarded.  Contrast that with the satisfaction he typically experiences with children he has related to.  They were more accepting and approving of his interest. "Children smile at me. I don't get vibes like that from

Page 3
IN RE:   Robert Jason Elder

adults."   The defendant is reluctant to put himself forward when interacting with new acquaintances. Highly sensitive to what he perceives to be others' thoughts about him, Robert acknowledged feeling more comfortable with children.  "They don't judge you."

Quick to find rejection among such persons as he has been friendly with, this is much worse since he has become notorious because of his arrest. Some youth have been ordered by their parents to avoid interacting with him. His job requiring a good deal of long-distance driving, Mr. Elder has found himself very irritable with drivers who do not take proper precautions.

Overall, Mr. Elder is not introspective about reasons for his inability to establish warm relations with other people.

The examiner did not challenge the defendant's strong convictions on a variety of subjects.  Example: Robert believes that seat belts would not be necessary if people drove properly.  But the examiner thought that Robert had a point when he distinguished between what he considers pornography (sexual acts on film) vis-à-vis photographs of naked people doing ordinary things like undressing and showering, activities exposing nude bodies.

*Interests:*   While he "hates" sports, the defendant is an avid collector of motion picture videotapes.  His favorite actors include Samuel L. Jackson, Nicholas Cage, and Denzel Washington. Robert owns about 5,000 of these videos and has not gotten around to watching about 1,000 of them.

*Sexual Stimuli:*   The subject's favored videotapes depict young boys taking their clothes off and showering.  He is not especially interested in observing sexual activities involving young males.

*Evaluation of Mood:*   The subject completed the Inventory of Depressive Symptomatology as the examiner looked on. The subject rated himself on the 28 specific items, describing his current status vis-à-vis his lifetime best status. The best level of adjustment (score = 23) is only moderately better than the present one (37). The current status is substantially impacted by the publicity that has surrounded Robert's arrest. The subject's lifetime best score is compatible with a mildly depressive outlook with several low-grade symptoms.

At present, Mr. Elder's most prominent current depressive complaints are anxiety, weight gain, self-criticism, hopelessness, lack of interest in activities, incapacity for pleasure and enjoyment, and fear and panic. The anxiety complaints are directly related to being in the public eye for reported criminal activities. Symptoms of atypical depression are prominent:  being hurt and rejected by others and feeling physically weighted down.

**TELEPHONE INTERVIEW WITH PARENTS:**   Mr. and Mrs. Elder were reached by telephone on June 9. They are suffering along with Robby from federally imposed restrictions on their everyday living.  Certain electronic apparatuses are forbidden from use, for example.

Our first topic was family history. Sharon Askey Elder can locate no male relatives who demonstrated pedophilic tendencies or were unmarried. Her husband was adopted as a child; his genetic background is completely unknown.

Page 4
IN RE:   Robert Jason Elder

Our second topic was the defendant's developmental history, already recorded by previous investigators. The Elders immediately specified their son's severe hoarding disorder. "Robby buys and buys!" His purchases clutter the entire house, not only the motion picture collection but multiples of many other items – like wrenches – some still in unopened packages. It seems that Robby draws satisfaction from those possessions and finds it almost impossible to throw things away, even useless items like wrapping paper and empty bags.

Another of Robby's perplexing practices is his avoidance of showering. Parents have no explanation for this.

For more than ten years Robby has been convinced that "everybody" is against him. "Nobody cares about me," he has verbalized. Robby would love to have a buddy, but outside of work he is a virtual isolate as he has been lifelong.

### O P I N I O N   S E C T I O N
*All opinions are rendered with reasonable medical certainty.*

### PSYCHIATRIC DIAGNOSTIC IMPRESSIONS:

MENTAL PROBLEMS:
1.  Chronic dysthymia exacerbated since the defendant's arrest and notoriety.
2.  Paraphilia with social interest in pre-adolescent boys with observation of nudity being fundamental as opposed to sexual activity.
3.  Hoarding disorder.

**DISCUSSION:**     Robert Elder, to this examiner, is more to be pitied than condemned. Through no fault of his own, he has been cursed with two rare conditions: pedophilia (fortunately without predation) and hoarding disorder, with accompanying minor traits like eyelid tic, intonation abnormality and indifference to personal hygiene. The clinical picture bears similarities to autism and paranoia. It was not long ago that the scientific community considered homosexuality to be a personality disorder and transgenderism was perceived as psychosis. Time, research, and experience can lead to new understandings of human behavior. From a modern scientific perspective, human behavior patterns result solely from genes and life experiences.

**STATEMENT ON THE ORIGIN OF PEDOPHILIA:**   There is evidence that this condition has a significant genetic origin. Theoretically a prenatal intrauterine change could also be a cause. Maternal family history is reported to be negative for this disorder, but paternal history is unknown.

**MANAGEMENT SUGGESTIONS:**     In recent months, Robert has worked with three different psychologists. It is not clear to the examiner whether the therapists have collaborated with one another. But there is no doubt that Mr. Elder can benefit from ongoing psychotherapy and, perhaps most important, group therapy as mechanisms for gaining insights into his own self-presentation and to develop ideas for future social ventures. A support group made up of individuals with similar sexual proclivities would probably be a great help. The website Virtuous

Page 5
IN RE:   Robert Jason Elder

Pedophiles can be resourced. Trials of antidepressants are definitely worthwhile, but the subject and his parents take a negative view of pharmacotherapy.

The defendant has a vital need for compassion from others, *especially* since he lacks appealing qualities – like youth, female gender, or physical abnormalities – that typically evoke sympathy. He should be studied from a genetic standpoint, now that the techniques have been developed that might shed light on his mysterious maladies. Hoarding, incidentally, is not simply a bad habit. It is the result of the brain's inability to evaluate the importance and the classification of individual objects.

**PROGNOSIS:**     The greatest risk in this case is the suicide of the defendant. In a way, he has been heroic, bearing with a burdensome existence with no obvious basis for hope. Meantime, he poses a negligible threat to society. He presents no real danger to living children.

## COMMENTS

### On Pedophilic Activity

It is normal and nearly universal that human beings seek sexual gratification. The object of their desire has been set inherently, and it is virtually impossible to change the trajectory to that object. A pedophilically-oriented person has no choice in what attracts him sexually. To comply with social and legal standards in the U.S., his only possibility is to restrain himself from interacting in person, physically, with objects of his attraction.

For Mr. Elder, the direction of his sexual attraction is toward young males in a voyeuristic manner. From society's standpoint, the best scenario is that such an individual limits his stimuli to images. Mr. Elder believed that he had done this. Involving actual preadolescent boys would be corruptive to the children – therefore, completely unacceptable to him.

Mr. Elder believed that the visual imagery that he purchased, the content of which seemed to him quite benign by comparison with pornography as generally imagined, had been approved officially – somehow – for public viewing. Not so, as it turned out.

In general, *drawn* illustrations may be the only legally permissible sexual stimuli for people attracted to preadolescent children.

Professor Margo Kaplan of Rutgers Law School has been arguing for years and at length that the assumption of U. S. law that pedophilia is itself a choice and a crime should be revised (see *Taking Pedophilia Seriously,* 72 Wash. & Lee Rev. 75 2015, pp. 74-170). Professor Kaplan points to suggestive biological evidence as clues to the involuntary nature of pedophilia. She also makes the point that those who commit sex crimes against children are mostly not pedophiles.

### On Potential Prison Adjustment

What might be the fate of Robert Jason Elder if imprisoned for a significant period of time? The very idea is Kafkaesque – poignantly horrific. This is a man with two major genetic oddities – pedophilia and hoarding. In his home environment he barely makes it through using isolation as a primary defense mechanism. He has a probably inborn aversion to close human

Page 6
IN RE:   Robert Jason Elder

isolation as a primary defense mechanism.  He has a probably inborn aversion to close human
contact.  He has a history of strong suicidal impulses when under stress.  As a "different" kind
of person and a supposed violator of children, he would be a likely target for a brutal fellow
prisoner seeking to elevate his jailbird sense of impotence and worthlessness by overpowering
and humiliating someone else.

Sincerely yours,

Joseph S. Silverman, M.D.

JSS/hal

# CURRICULUM VITAE

## Joseph S. Silverman, M.D.
4304 Lynndale Road
Altoona, PA  16602
Phone (814) 943-6609
Fax (814) 943-5219
E-mail jsspks@aol.com

**DATE OF BIRTH:** 23 August 1933       **BIRTHPLACE:** Altoona, PA

## EDUCATION, TRAINING, AND EXPERIENCE:

| | |
|---|---|
| September 1951 to June 1955 | Cornell University, Ithaca, NY, BA, Major in Psychology |
| September 1955 to June 1959 | University of Pittsburgh School of Medicine, MD |
| June 1958 to August 1958 | St. Elizabeth's Hospital, Washington, DC, Extern |
| July 1959 to June 1960 | West Penn Hospital, Pittsburgh, Intern (rotating) |
| July 1960 to June 1963 | Western Psychiatric Institute, University of Pittsburgh, Teaching Fellow |
| June 1963 to June 1965 | Walson Army Hospital and Fort Dix Mental Hygiene Consultation Service, Fort Dix, NJ, Psychiatrist and Captain, U.S. Army Reserves |
| July 1965 to May 1966 | Hollidaysburg (PA) State Hospital Outpatient Clinic, Psychiatrist |
| May 1966 to December 2000 | The Altoona Hospital, Altoona, PA, Medical Staff |
| July 1966 to September 2011 | Altoona Veterans Administration Hospital, Consultant in Psychiatry |
| July 1966 to December 1968 | Blair County Mental Health Center, Psychiatrist |
| September 1966 to June 1991 | Blair County Board of School Directors, Department of Psychological Services (Later:  Intermediate Unit 08 Mental Health Team), Consultant in Psychiatry |
| September 1966 to December 2000 | 501 Howard Avenue, Altoona, PA, Private Practice |
| July 1967 to July 1970 | Pennsylvania Association for the Blind, Consultant in Psychiatry |
| September 1967 to June 1970 | ESEA Title III, Mental Health Consulting Team for Blair, Bedford, Cambria, and Somerset Counties, Consultant |
| July 1979 to June 1987 | Pennsylvania State University College of Medicine Clinical Assistant Professor of Family and Community Medicine |
| July 1983 to June 1996 | Mercy Hospital, Altoona, PA, Medical Staff |
| January 2001 to January 2008 | The Altoona Hospital, Altoona, PA, Emeritus Medical Staff (currently, Altoona Regional Health System) |
| January 2003 to June 2003 | Reviewer for Pennsylvania Department of Welfare/Medical Assistance |
| January 2008 to Present | Altoona Regional Health System, Honorary Medical Staff |
| July 2003 to Present | KePRO (Keystone Peer Review Organization, Pennsylvania Medical Society) |

## CERTIFICATIONS:

| | |
|---|---|
| May 1966 | Diplomate, American Board of Psychiatry and Neurology |
| June 1974 | Fellow, American Psychiatric Association |
| July 1975 | Physician's Recognition Award, AMA-CME |
| July 1978 | Physician's Recognition Award, AMA-CME |
| August 1981 | Physician's Recognition Award, AMA-CME |
| August 1984 | Physician's Recognition Award, AMA-CME |
| August 1987 | Physician's Recognition Award, AMA-CME |
| August 1990 | Physician's Recognition Award, AMA-CME |
| August 1993 | Physician's Recognition Award, AMA-CME |
| August 1996 | Physician's Recognition Award, AMA-CME |
| August 1999 | Physician's Recognition Award, AMA-CME, Commendation for Self-Directed Learning |
| September 2002 | Physician's Recognition Award, AMA-CME |
| August 2005 | Physician's Recognition Award, AMA-CME |
| August 2008 | Physician's Recognition Award, AMA-CME |
| August 2011 | Physician's Recognition Award, AMA-CME |

## AFFILIATIONS:

| | | |
|---|---|---|
| Since July 1959 | Pennsylvania Medical Society | |
| Since February 1961 | American Medical Association | |
| Since May 1965 | Pennsylvania Psychiatric Society | |
| | Governmental Relations Committee | April 1978 to July 1992 |
| Since May 1965 | American Psychiatric Association | |
| | Fellow | June 1974 |
| | Life Fellow/Distinguished Fellow | January 1997 |
| | Pennsylvania Medical Political Action Committee | |
| | Board of Directors | February 1976 to February 1981 |
| | Treasurer | February 1980 to February 1981 |
| Since June 1965 | Blair County Medical Society | |
| | Board of Directors | July 1976 to December 1980 |
| | President-Elect | January 1981 to February 1982 |
| | President | February 1982 to December 1982 |
| January 1966 to June 1990 | Mid-State Medical Psychology Society | |
| | Program Chairman | |
| July 1963 to April 2003 | University of Pittsburgh School of Medicine, Department of Psychiatry | |
| | Clinical Assistant Instructor | |

## PUBLICATIONS:

**Psychiatric Communications:**
"Hypnosis as an Aid in Psychotherapy," 4: 12, 1961
"Persistent Phenothiazine Akathisia," 4: 37, 1961
"Responses of Psychiatric Patients to a Battery of Cartoons and Jokes," 6: 9, 1963
(with A. Yorukoglu, M.D.)

**American Journal of Psychiatry:**
"Multiple Personality as Sequel to Hyperventilation Syndrome," 122: 217, 1965
"Hyperventilation Syndrome," 125: 1452, 1969
Book review, Gary E. Schwartz, David Shapiro (eds): Consciousness and Self-Regulation: Advances in Research, Vol. I, 134: 1464, 1977
Book review, Gary E. Schwartz, David Shapiro (eds): Consciousness and Self-Regulation: Advances in Research and Theory, Vol. 2, 136: 366, 1979

**The Pennsylvania Medical Assistant:**
"Psychotherapy and the Medical Assistant," 6 (No. 2, Winter): 4, 1983

**Archives of General Psychiatry:**
"Do Maladaptive Attitudes Cause Depression?" 41: 28-30, 1984 (with Julia A. Silverman, David A. Eardley, DEd)
Letter to the Editor: In Reply to John H. Riskind, PhD, Robert Steer, EdD
"Do Maladaptive Attitudes 'Cause' Depression?: Misconception of Cognitive Theory" 41: 1112, 1984

**Pennsylvania Psychiatrist:**
Letter to the Editor: "A New Type of CME," 12-13, October 1983
Letter to the Editor: "Psychiatrists Should Also Join the AMA," 14, September 1986
Letter to the Editor: "Therapeutic Passes," 10, June 1989
Letter to the Editor: "Workers' Compensation," 10-11, December 1993
Letter to the Editor: "Managed Care," 11, March 1996
Letter to the Editor: "Free Enterprise, Fraud, and the IME: Dr. Faust Is Alive and Well and Living in Pennsylvania," 4-5, January 2000

**Psychiatric News:**
Letter to the Editor: "Insurance," 2, March 6, 1987
Letter to the Editor: "Disability Tricks," 26, November 17, 2000
Letter to the Editor: "Member Input," 26, August 17, 2001

**The Humanist:**
Letter to the Editor: "Mental Health vs. Religion," 50, November-December 1987

**The Journal of Neuropsychiatry and Clinical Neurosciences:**
"Brain-Mapping Abnormalities in a Family With Three Obsessive-Compulsive Children," Vol. 2, (No. 3, Summer): 319, 1990

Joseph S. Silverman, M.D.
Page 4

## PUBLICATIONS, CONTINUED:

**Cortlandt Forum:**
Comment: "Don't Panic — Alprazolam," 114, April 1991
Comment: "Reducing Depression Recurrence," 134, May 1991
Comment: "Informing About Futility," 130, September 1991
Comment: "Anyone Can Be a Drug Addict," 138, November 1991
Comment: "Stress Management in Diabetes," 117, December 1991
Comment: "Personality Changes in Dementia," 189, January 1992
Comment: "Compelling Evidence for OCD Drug," 230, February 1992
Comment: "Genetics of Male Sexual Orientation," 211, March 1992
Comment: "Combined Therapy for Social Phobia," 222, April 1992
Comment: "Meditation Revived," 178, May 1992
Comment: "In Defense of ECT," 208, June 1992
Comment: "A Doctor in the House," 226, July 1992

**Hudson Monitor:**
Comment: "Do You Advocate Corporal Punishment?" 45, January 1993
Comment: "Is Tacrine Effective for Alzheimer's Disease? Yes," 55, February 1993
Comment: "Seven Chronic Risk Factors, Including Depression, Help Identify the Suicidal Alcoholic," 29, May 1993

**Cambridge Quarterly of Healthcare Ethics:**
"Graceful Exit: A Useful Concept," 2: 543, 1993

**Pennsylvania Medicine:**
"A New Approach to Health System Reform: Seizing the Moral High Ground," Vol. 98, 6: 28-30, June 1995
Letter to the Editor: "Patients Deserve a Graceful Exit," Vol. 100, 4: 4, April 1997

**Bulletin of the Altoona Hospital Medical Staff:**
"When in Doubt, Do the Right Thing (?) -- A Proposal to Physicians on Health Care Reform," Vol. 2, 1: 25-30, June 1995

**Journal of Rational-Emotive and Cognitive-Behavior Therapy:**
"Fallacies About Love and Marriage," Vol. 16, 4: 255-259 Winter 1998

**Psychiatric Times:**
Letter to the Editor: "Who Pays the Fiddler Calls the Tune," Vol. 18, 1: 12, January 2001

**Lifarsline:**
Commentary: "Is Psychiatry Primarily a Business or Profession?" Vol. 6, 2: 5, November 2008

**Johnstown Tribute Democrat:**
Editorial: "Choosing Wisely: Mistakes Voters Make," October 30, 2008
Editorial: "Religious and Moral Values: The Difference Matters," October 22, 2009

**Psychiatric Annals:**
In preparation for Fall 2013 – Editor, "Restoring Idealism and Activism. The Attenuation of American Psychiatry – Possibilities for Revitalization"

## PRESENTATIONS AT NATIONAL MEETING:

"Psychiatrist and Spouse as Office Partners," American Psychiatric Association Annual Meeting, New York City, May 1983

**ERICKSON PSYCHOLOGICAL SERVICES, LLC**
John R. Erickson, Ph.D.
315 South Allen Street, Suite 421
State College, PA 16801
(814) 466-2133

September 7, 2016

Judge Matthew Brann
United States Middle District Court of Pennsylvania

RE:   Robert Elder
DOB:   8/24/1976

Dear Judge Brann:

I understand that Robert Elder is coming before you related to charges of possession of child pornography. Please note that, upon recommendation of the court and probation, and with the encouragement of his parents, I have evaluated and been providing psychotherapy treatment on a weekly to bi-weekly basis for Robert, with our first session occurring April 11, 2016. We have met for 22 sessions.

Robert grew up as an only child of his parents, with whom he has always lived in Bellefonte, PA. He reports having obtained a bachelor's in Elementary Education from Lock Haven University. He reports that he did not care for many aspects of teaching, including having to deal with parents of children that he was charged with teaching. He reports having various jobs until his current one four years ago making drywall deliveries.

At our initial session, Robert endorsed experiencing depressive symptoms in the moderate range on the Burns Depression inventory. Asked if he was depressed, Robert replied "I wonder why God put me here," complaining that he feels no purpose. He reports being tired all the time and sleeping a lot. I currently have him diagnosed with an Unspecified Depressive Disorder and Adjustment Disorder with mixed features of Anxiety and Depression, as well as Pedophilic Disorder. He denies current suicidal or homicidal ideas, though admits a history of suicidal ideas when he was around eighteen years old and stressed while attending Penn State University before he attended Lock Haven University. This history suggests that his depression is longstanding, and more than a reaction to his current legal circumstances.

Particularly painful to Robert are the relationships that he has with people. He reports a sense that, throughout his life, others have taken advantage of him and let him down. He states that "the list of people that have screwed me just keeps growing." He does seem to be genuinely interested in others and in trying to be helpful, though states that he feels "clueless" about people. Much of his dynamic with people has been set up by low self-esteem he has experienced since childhood, which he has made efforts to overcome by trying to "buy friends" who then take advantage of him. Social isolation, such as Robert's, is a risk factor in pedophilia.

---

(814) 826-2585 (confidential fax)
www.EricksonPsychServices.com
Erickson.Psych.Services@gmail.com (non-urgent communications only)

**EXHIBIT**
**K**

**ERICKSON PSYCHOLOGICAL SERVICES, LLC**
John R. Erickson, Ph.D.
315 South Allen Street, Suite 421
State College, PA 16801
(814) 466-2133

Disillusioned with and perplexed by his peer relationships, he reports that it has been easier for him to relate to children, who he feels empathy for. "I hate to see a kid hurt. Kids need to be helped," he states, though he admits regret that his activities with pornography may have contributed in some way to hurting children. With genuine regret, he reports: "I know what I did was wrong. I went too far." There was no content or history presented in our psychotherapy sessions which suggested that Robert has directly been or would be of future harm or danger to children or others, however, especially with adequate treatment.

Robert enjoys work and seems highly productive. He reports getting along with co-workers, and he takes pride in doing his job well. He states: "I like to work. It feels good to help, and it keeps my mind off life."

Robert's prognosis in psychotherapy is good. Though sometimes perseverative in his thought processes, he demonstrates a capacity for insight. And he is motivated to change, stating: "Being bitter wears me down. I'm tired all day long. I want to change this." Of his anger at the state of his life, Robert says "I'm trying to work on it," and is trying to maintain hope and faith that "maybe someday God will help me understand my purpose here" and why he has experienced so much pain in his life. He states that he does not want to harm children, even if indirectly through pornographic material. The focus of psychotherapy includes better understanding and management of any sexual urges he may have that are stimulated by or toward children, helping Robert to find ways to let go of unneeded stress and achieve different perspectives on things that bother him, determining ways for him to achieve greater satisfaction and success socially to reduce isolation, improve self-esteem, and provide restoration of hope. I am quite optimistic that Robert will be able to make progress in his psychotherapy, contributing to reduction and management of pedophilic urges.

Please let me know if additional information would be helpful.

Sincerely,

John R. Erickson, Ph.D.
Licensed Psychologist

(814) 826-2585 (confidential fax)
www.EricksonPsychServices.com
Erickson.Psych.Services@gmail.com (non-urgent communications only)

**JOHN R. ERICKSON, PH.D.**
**Erickson Psychological Services, LLC**
**315 South Allen Street, Suite 421**
**State College, PA  16801**
**(814) 466-2133**
**Erickson.psych.services@gmail.com**

## EDUCATION

Pennsylvania State University, University Park, PA
Doctor of Philosophy, Counseling Psychology, 1993

The Bryn Mawr College Graduate School of Social Work and Social Research, Bryn Mawr, PA
Master of Social Science, Clinical Social Work Specialty, 1980

Saint Olaf College, Northfield, MN
Bachelor of Arts, Cum Laude, English Major, 1971

## HONORS

Appointment as Adjunct Assistant Professor of Counseling Psychology, Penn State University.

A Past President of the Central Pennsylvania Psychological Association

## LICENSE

Licensed Psychologist, Pennsylvania, PS-007918-L

## ASSOCIATIONS

Pennsylvania Psychological Association
American Psychological Association

## PROFESSIONAL EXPERIENCES

**Licensed Psychologist, Private Practice, Erickson Psychological Services, LLC, State College, PA**
**March 2015 to Present**
In my solo private practice office, I provide counseling and psychotherapeutic treatment to a wide range of adults and adolescents on an outpatient basis, with a specialization in

interpersonal and cognitive behavioral approaches to treating depressed and anxious clients, as well as severe and chronic mental disorders and many other presenting concerns. I also provide clinical consultations to social service agencies as well as conduct a clinical supervision group for mental health professionals working to achieve licensed status.

**Licensed Psychologist, Private Practice, Sunpointe Health, State College, PA**
**February 1996 to March 2015**
Within a group practice setting, I provided counseling and psychotherapeutic treatment to a wide range of adults and adolescents on an outpatient basis, specializing in interpersonal and cognitive behavioral approaches to treating depressed and anxious clients, as well as severe and chronic mental disorders and many other presenting concerns. I also provided clinical supervision to post-doctoral psychologists at the center

**Licensed Psychologist, Meadows Psychiatric Center, Centre Hall, PA and Universal**
**Community Behavioral Health**
**September 1995 to June 2014**
I was responsible for performing individual, group and family therapy sessions, as well as psychological testing evaluations throughout the 101-bed inpatient facility, the Meadows, whose population consisted of children, adolescents and adults with a wide range of acute and chronic mental health conditions. I also supervised the advanced practicums of doctoral students in the Counseling Psychology program from Penn State University, as well as rotations at the Meadows of pre-doctoral interns from the Penn State Counseling and Psychological Service. Additionally, I provided consultations for the Mobile Crisis workers from the Meadows. I also conducted trainings for Meadows staff.

Through the outpatient affiliate of the Meadows, Universal Community Behavioral Health, I provide clinical supervision of licensed and unlicensed masters-level therapists at the Lewistown and Huntingdon licensed mental health outpatient clinics. I also conducted individual therapy sessions for outpatient clients through the Lewiston clinic

During my time at the Meadows, I held administrative positions that included Director of Clinical Services as well as Director of Psychology.

**Mental Health Evaluator, Department of Behavioral Health Services, Lewistown**
**Hospital, Lewistown, PA**
**September 1993 to September 1995**
On the inpatient psychiatric unit of this general hospital, I was primarily responsible for conducting psychological testing assessments with adolescent and adult patients. I also conducted individual and family therapy sessions, and carried a caseload of clients through the hospital's outpatient clinic. Additionally, I conducted consults for patients on medical units of the hospital and facilitated a prostrate cancer support group.

**Psychology Intern, Friends Hospital, Philadelphia, PA**
**September 1992 to August 1993**
I conducted individual and group psychotherapy sessions on an inpatient and outpatient basis, as well as full-battery psychological assessments, at this 190-year-old institution, one of the first psychiatric hospitals in the United States.  Rotations included Adolescent, Geropsychiatry, Acute Day Treatment and Adult.

**Director of Partial Hospitalization Program (Counsel House), Counseling Service, Inc., Bellefonte, PA**
**August 1989 to October 1991**
I was responsible for clinical and administrative supervision of clinical staff in this program, which provided crisis stabilization and intensive treatment of adult clients with acute and chronic psychiatric disorders.  I conducted individual, group and family counseling sessions, as well as psychological assessments.

**Doctoral Student, Counseling Psychology Program, Pennsylvania State University, University Park, PA**
**August 1986 to August 1989**
While active as a full-time student, I maintained an assistantship as an Intake Supervisor of the training clinic for graduate counseling programs in the College of Education, conducting intake evaluations of clients and emergency crisis evaluations.  My doctoral practicums included training in leading a psychodynamically-focused psychotherapy group under the supervision of Allan Elfant, a Fellow in the American Group Psychotherapy Association.

**Psychotherapist, Suburban Counseling Center, Bryn Mawr, PA**
**August 1984 to July 1986**
At this privately-owned, licensed mental health facility, I conducted individual, group and family counseling sessions for adolescents and adults on a fee-for-service basis.

**Clinician, Mental Health Outpatient Department, P.A.T.H., Inc., Philadelphia, PA**
**July 1980 to March 1985**
At this Community MH/MR Center, I conducted individual, group and family counseling and psychotherapy sessions with a population of chronic and acute adult and geriatric clients.  I supervised masters-level social work students for three years as a Field Instructor for Bryn Mawr College.  I also participated in a year-long family therapy training seminar conducted by the Child Guidance Clinic of Philadelphia.

**Masters Student, Bryn Mawr College Graduate School of Social Work and Social Research, Bryn Mawr, PA**
**September 1979 to May 1980**
Practicum work during my second year in the program included working three days per week at the Benjamin Rush Center, a community mental health center in Philadelphia, where I conducted individual, group and family psychotherapy sessions with adults. I also participated there in an intensive group therapy training seminar. My first year practicum, which was two days per week, was at the Eastern Pennsylvania Psychiatric Institute in Philadelphia. I was responsible for social assessments and discharge plans for a caseload of patients, as well and conducting assessment and treatment sessions with family members of hospitalized patients.

**Commissioned Officer, U. S. Coast Guard Reserves, Philadelphia, PA**
**August 1978 to October 1984**
I achieved the rank of Lieutenant Commander and served for two years as the Commanding Officer of a forty-member reserve unit. As Commanding Officer I was responsible for establishing unit policies, determining priorities among the various unit responsibilities and supervising evaluation of personnel. Unit activities included search-and-rescue response, and enforcement of federal vessel safety and water pollution regulations during the monthly drill weekends.

**Counselor, East Philadelphia Environmental Center, Philadelphia, PA**
**January 1978 to August 1978**
In a group home for court-adjudicated adolescents, I conducted group counseling sessions with residents, and coordinated educational and supported-work services.

**Environmental Control Specialist, Clean Water, Inc., Philadelphia, PA**
**June 1976 to June 1977**
As head of the Philadelphia office of this Toms River based company, I coordinated oil pollution containment and cleanup efforts, working closely with federal and state enforcement officials.

**Commissioned Officer, U. S. Coast Guard, Philadelphia, PA**
**February 1972 to June 1975**
During this active duty period, I primarily served as the Port Safety Officer, managing a department of enlisted men and other officers responsible for enforcing federal environmental and vessel safety regulations in the port of Philadelphia, then the third busiest port in the world.



THE MEADOWS
Universal Community Behavioral Health

August 4, 2016

Judge Matthew Brann
United States District Judge
Middle District of Pennsylvania

Judge Brann:

I have been asked to provide feedback concerning my client, Robert Elder (DOB: 08/24/1679). Robert initiated services on March 29, 2016, and has attended five clinical sessions in all.

Robert has been forthcoming regarding the situation and behaviors that led to his current legal charges. He has also reviewed his past history of mental health issues, social interactions, and employments, and has been receptive to discussing the larger psychological picture of attitudes and moods which have been contributed to his current difficulties,

Robert is receptive to feedback and appears motivated to doing whatever is necessary to rectify his current troubles. In my clinical opinion, I do not see Robert as a potential threat to the emotional or physical well-being of other people.

Please contact if additional feedback is needed.

Barry R Brink, Ph.D
Licensed Psychologist

132 The Meadows Drive, Centre Hall, PA 16828 | ph 814.364.2161 / fax 814.364.9742 | www.themeadows.net

OUTPATIENT CLINICS-CENTRE COUNTY-BELLEFONTE 814.355.5151 / CLINTON COUNTY MILL HALL 570.726.4506 / HUNTINGDON COUNTY - HUNTINGDON 814.643.0309 / JUNIATA COUNTY-MIFFLINTOWN 717.436.8482 / MIFFLIN COUNTY-LEWISTOWN 717.248.8197  PARTIAL HOSPITALIZATION - CENTRE COUNTY-BELLEFONTE 814.355.1487 / FRANKLIN COUNTY-CHAMBERSBURG 717.263.8272 / CLINTON COUNTY-MILL HALL 570.726.4316 / CLEARFIELD COUNTY - PHILIPSBURG 814.342.8090 / YORK COUNTY-YORK 717.757.4229  BELLEFONTE STARS ELEMENTARY PROGRAM - 814.557.2326  REACH BELLEFONTE M.S. PROGRAM -814.355.5466 EXT. 5706  FAMILY BASED MENTAL HEALTH-HUNTINGDON COUNTY 814.643.0309 / MIFFLIN-JUNIATA COUNTY 717.242.9530 / CENTRE COUNTY 814.355.3151 CRISIS INTERVENTION-CLEARFIELD & JEFFERSON COUNTIES 800.341.5040 / CENTRE COUNTY CAN HELP 800.643.5432 / HUNTINGDON, MIFFLIN & JUNIATA COUNTIES 800.929.9583 / BEDFORD & SOMERSET COUNTIES 866.611.6467 BEHAVIORAL HEALTH REHABILITATION SERVICES-BEDFORD COUNTY 814.623.2220 / BLAIR COUNTY 814.946.9142 / CENTRE COUNTY 814.355.1491 / MIFFLIN-JUNIATA COUNTIES 717.242.2283 / CLEARFIELD COUNTY 814.343.6640 / HUNTINGDON COUNTY 814.643.0309 / FRANKLIN-FULTON COUNTY 717.262.2940 / NORTHUMBERLAND COUNTY 570.286.8848 / CLINTON-LYCOMING COUNTY 570.726.4502 BLENDED CARE MANAGEMENT-HUNTINGDON COUNTY 814.643.0309 PEER SUPPORT SERVICES-CENTRE COUNTY 814.355.3151 / CLINTON COUNTY

EXHIBIT

L

tabbies

# CURRICULUM VITAE

Barry R. Brink, Ph. D. PC
Clinical Psychologist
Pennsylvania License Number:  PS-008801-L

.

## EDUCATION:

University of Texas Health Science Center at Dallas (APA approval: May 1986):
Ph.D. in Clinical Psychology, December 12, 1986

Trinity University, San Antonia, Texas:
M.A. Candidate in Clinical Psychology, September 1979 to June 1980

Montclair State College, Upper Montclair, New Jersey:
New Jersey State Teacher Certification, June 1976

Dartmouth College, Hanover, New Hampshire:
A.B. in Anthropology, June 1971

## PROFESSIONAL EXPERIENCE:

October 2014 to Present

Clinical Psychologist, Universal Community Behavioral Health, Bellefonte, Pennsylvania
Services: Child, family, and adult psychotherapy, clinical assessments, supervision of
staff.

September 2003 to Present

Private Practice, State College, Pennsylvania
Services:  Individual (adult and child), marital, and family psychotherapy; assessment of
learning, behavioral, and emotional disorders; assessment and behavioral management of
ADHD; medical, school and media consultation; social skills group counseling; parent
group counseling for child management; forensic and child custody evaluation,
assessment of PTSD and emotional functioning for veteran disability determination..

July 1998 to August 2003

Clinical Psychologist, MidStep Child Development Center, State College, Pennsylvania

Services:  Individual (adult and child), marital, group, and family psychotherapy; academic, intellectual, and personality assessment; medical, school, and media consultation.

November 1992 to July 1998

Clinical Psychologist, Silber Psychological Services, Raleigh, North Carolina
Services:  Individual (adult and child), marital, group, and family psychotherapy; academic, intellectual, and personality assessment; medical, school, and media consultation.

March 1988 to October 1992

Private Practice, Fort Worth, Texas
Services: Clinical practice with subspecialty in pediatric psychology. Child, family, and adult psychotherapy, inpatient assessment and counseling to the patients and families of pediatric cancer, cystic fibrosis, and endocrine clinics, medical and school consultation, marital therapy, hypnotherapy, and assessment of learning, behavioral, and emotional disorders.

January 1987 to June 1988

Clinical Psychologist, the Office of Alys Haugen, Ph.D., Granbury, Texas
Services:  Individual (adult and child), marital, and family psychotherapy; academic, neuropsychological, and personality assessment; consult – liaison with Fort Worth psychiatric hospitals.

December 1986 to March 1988

Supervised Psychologist in the Office of Swen Heige, Ph.D., Fort Worth, Texas
Services:  Individual (adult and child), marital, and family psychotherapy; psychological assessment; consult – liaison to pediatric subspecialty clinics at Cook-Fort Worth Children's Hospital.

March 1986 to April 1988

Clinical Psychology Consultant, Schick Shadel Hospital, Fort Worth, Texas
Services:  Mental status examinations; consult – liaison to medical services; follow-up outpatient psychotherapy.

May 1984 to July 1986

Staff Psychologist, Texas Scottish Rite Hospital, Dallas, Texas
Services:  Inpatient consult – liaison to general pediatric, and pediatric orthopedic and neurology services; psychological and neuropsychological assessment of children and adolescents; individual and family psychotherapy; in-service training to support staff.

EDUCATIONAL EXPERIENCE:

June 1981 to May 1984

> University of Texas Health Science Center at Dallas, Dallas, Texas:
> Clinical Psychology Internship (A.P.A approval: September 1986)

INTERNSHIP ROTATIONS (1982 – 1984):

> Texas Scottish Rite Hospital, Dallas, Texas
> Services: Same as those listed above.

> Dallas County Juvenile Department, Dallas, Texas
> Services: Psychological assessment of adolescents; short-term individual, family, and group psychotherapy, consult – liaison to center staff; crisis intervention counseling.

> Department of Psychology, University of Texas Health Science Center at Dallas, Dallas, Texas
> Services: Administration and interpretation of Halstead – Reitan Neuropsychological Test Battery.

> Consult – Liaison Service, Department of Psychiatry, Parkland Memorial Hospital, Dallas, Texas
> Services: Psychological and neuropsychological assessment of patients on the neurology, neurosurgery, internal medicine, surgery, orthopedic, and burn unit floors; clinical supervision of medical students; brief inpatient psychotherapy.

> Psychiatric Emergency Room, Parkland Memorial Hospital, Dallas, Texas
> Services: Emergency evaluation, treatment planning, and disposition planning of a full range of emotional and behavioral disorders; consultation to medical staff; evaluation of patients for commitment proceedings.

> Southwestern Clinic, Department of Psychiatry, University of Texas Southwestern Medical School, Dallas, Texas
> Services. Individual psychotherapy in an outpatient setting

> Terrell State Hospital, Terrell, Texas
> Services: Evaluation and treatment planning in an inpatient setting for behaviorally disruptive, mentally retarded adults; short-term psychotherapy with violent and self-abusive patients; development of behavior modification programs.

> Parkland Memorial Hospital-Inpatient Psychiatric Unit, Dallas, Texas
> Services: Consultation to Special Education teachers; individual psychotherapy with emotionally disturbed adolescents; academic and psychological assessment.

PROFESSONAL ORGANIZATIONS:

> American Psychological Association

Central Pennsylvania Psychological Association
Association of Family and Conciliation Courts

## COMMUNITY SERVICE:

Cook-Fort Worth Children's Hospital, Fort Worth, Texas
Institutional Review Board, 1989 to 1991

## ADDITIONAL WORK EXPERIENCE:

September 1976 to June 1977

Vernon Independent School District, Vernon, New Jersey
Director of "Project Active," a State-funded program in adaptive physical education
Services: Development and implementation of individual fitness programs for children
with asthma, low motor ability, obesity, auditory and/or visual disabilities, and
orthopedic injuries.

August 1972 to August 1974

Columbia University, New York City, New York
Services: Assistant football coach and recruiting coordinator

## ATHLETIC HONORS:

Named to All American (mention), All East, All New England, and All Ivy football
teams, 1970

East-West Shrine Game, Oakland, California: January 2, 1971;
Hula Bowl, Honolulu, Hawaii, January 9, 1971

## REFERENCES:

Available upon request

## Sex Offender Treatment Program – Nonresidential

| | |
|---|---|
| **Program Description** | The Sex Offender Treatment Program – Nonresidential (SOTP-NR) is a moderate intensity program designed for low to moderate risk sexual offenders. The program consists of cognitive-behaviorally based psychotherapy groups, totaling 4-6 hours per week. |
| **Time Frame** | Inmates are ordinarily placed in the SOTP-NR during the last 36 months of their sentence and, prioritized by release date. The typical duration of the SOTP-NR is 9-12 months. |
| **Admission Criteria** | Most participants in the SOTP-NR have a history of a single sex crime; many are first time offenders serving a sentence for an Internet Sex Offense. The program is voluntary. Prior to placement in the SOTP-NR, prospective participants are screened with a risk assessment instrument to ensure their offense history is commensurate with moderate intensity treatment. |
| **Program Content** | The SOTP-NR was designed to target dynamic risk factors associated with re-offense in sex offenders, as demonstrated by empirical research. These factors include: sexual self-regulation deficits and sexual deviancy; criminal thinking and behavior patterns; intimacy skills deficits; and, emotional self-regulation deficits. The program employs cognitive-behavioral techniques, with a primary emphasis on skills acquisition and practice. |
| **Empirical Support** | The SOTP-NR was designed to conform to the characteristics of sex offender treatment programs with proven effectiveness in reducing re-offense as demonstrated by outcome research. These characteristics include: 1) stratification of treatment into separate tracks for high and low/moderate risk offenders; 2) targeting empirically demonstrated dynamic risk factors; and 3) training and oversight to ensure fidelity with the program model. |
| **Applicable Policies** | PS 5324.10 Sex Offender Programs. |
| **Institution Locations** | Nonresidential Sex Offender Treatment Programs are available at the following facilities: |

Nonresidential Sex Offender Treatment Programs are available at the following facilities:

| Mid-Atlantic Region | North Central Region | Northeast Region |
|---|---|---|
| FCI Petersburg- Medium | FCI Englewood, CO-Low USP Marion, IL-Medium | FCI Elkton, OH-Low |

| South Central Region | Southeast Region | Western Region |
|---|---|---|
| FMC Carswell, TX-Med. Ctr. (Females) FCI Seagoville, TX-Low | FCI Marianna, FL-Medium | USP Tucson, AZ-High |



EXHIBIT
M

Table 27

## SENTENCES RELATIVE TO THE GUIDELINE RANGE
### BY EACH PRIMARY OFFENSE CATEGORY[1]
#### Fiscal Year 2015

| PRIMARY OFFENSE | TOTAL | WITHIN GUIDELINE RANGE | | UPWARD DEPARTURES[2] | | UPWARD DEPARTURES W/ *BOOKER*[2] | | ABOVE RANGE W/ *BOOKER*[2] | | REMAINING ABOVE RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 68,270 | 32,262 | 47.3 | 349 | 0.5 | 95 | 0.1 | 1,002 | 1.5 | 60 | 0.1 |
| Murder | 91 | 47 | 51.6 | 3 | 3.3 | 0 | 0.0 | 2 | 2.2 | 0 | 0.0 |
| Manslaughter | 52 | 22 | 42.3 | 10 | 19.2 | 2 | 3.8 | 5 | 9.6 | 0 | 0.0 |
| Kidnapping/Hostage Taking | 43 | 18 | 41.9 | 0 | 0.0 | 1 | 2.3 | 1 | 2.3 | 2 | 4.7 |
| Sexual Abuse | 527 | 235 | 44.6 | 13 | 2.5 | 2 | 0.4 | 19 | 3.6 | 0 | 0.0 |
| Assault | 718 | 411 | 57.2 | 18 | 2.5 | 9 | 1.3 | 33 | 4.6 | 3 | 0.4 |
| Robbery | 738 | 349 | 47.3 | 13 | 1.8 | 5 | 0.7 | 29 | 3.9 | 0 | 0.0 |
| Arson | 59 | 20 | 33.9 | 1 | 1.7 | 0 | 0.0 | 6 | 10.2 | 0 | 0.0 |
| Drugs - Trafficking | 20,027 | 7,028 | 35.1 | 79 | 0.4 | 12 | 0.1 | 179 | 0.9 | 12 | 0.1 |
| Drugs - Communication Facility | 316 | 159 | 50.3 | 0 | 0.0 | 0 | 0.0 | 5 | 1.6 | 0 | 0.0 |
| Drugs - Simple Possession | 448 | 429 | 95.8 | 0 | 0.0 | 0 | 0.0 | 3 | 0.7 | 0 | 0.0 |
| Firearms | 7,049 | 3,713 | 52.7 | 65 | 0.9 | 19 | 0.3 | 250 | 3.5 | 15 | 0.2 |
| Burglary/B&E | 36 | 20 | 55.6 | 1 | 2.8 | 0 | 0.0 | 3 | 8.3 | 0 | 0.0 |
| Auto Theft | 62 | 37 | 59.7 | 0 | 0.0 | 0 | 0.0 | 4 | 6.5 | 0 | 0.0 |
| Larceny | 873 | 486 | 55.7 | 2 | 0.2 | 0 | 0.0 | 14 | 1.6 | 0 | 0.0 |
| Fraud | 7,047 | 2,836 | 40.2 | 30 | 0.4 | 6 | 0.1 | 97 | 1.4 | 8 | 0.1 |
| Embezzlement | 329 | 182 | 55.3 | 0 | 0.0 | 0 | 0.0 | 2 | 0.6 | 0 | 0.0 |
| Forgery/Counterfeiting | 511 | 302 | 59.1 | 1 | 0.2 | 0 | 0.0 | 12 | 2.3 | 1 | 0.2 |
| Bribery | 216 | 65 | 30.1 | 0 | 0.0 | 0 | 0.0 | 2 | 0.9 | 0 | 0.0 |
| Tax | 559 | 152 | 27.2 | 1 | 0.2 | 0 | 0.0 | 5 | 0.9 | 0 | 0.0 |
| Money Laundering | 667 | 197 | 29.5 | 3 | 0.4 | 0 | 0.0 | 1 | 0.1 | 0 | 0.0 |
| Racketeering/Extortion | 1,005 | 381 | 37.9 | 3 | 0.3 | 0 | 0.0 | 11 | 1.1 | 0 | 0.0 |
| Gambling/Lottery | 76 | 38 | 50.0 | 0 | 0.0 | 0 | 0.0 | 1 | 1.3 | 0 | 0.0 |
| Civil Rights | 46 | 15 | 32.6 | 1 | 2.2 | 0 | 0.0 | 1 | 2.2 | 0 | 0.0 |
| Immigration | 20,608 | 11,822 | 57.4 | 82 | 0.4 | 24 | 0.1 | 210 | 1.0 | 16 | 0.1 |
| Child Pornography | 1,903 | 584 | 30.7 | 3 | 0.2 | 5 | 0.3 | 27 | 1.4 | 0 | 0.0 |
| Prison Offenses | 468 | 323 | 69.0 | 0 | 0.0 | 1 | 0.2 | 13 | 2.8 | 0 | 0.0 |
| Administration of Justice Offenses | 1,165 | 633 | 54.3 | 11 | 0.9 | 5 | 0.4 | 34 | 2.9 | 1 | 0.1 |
| Environmental/Wildlife | 140 | 63 | 45.0 | 0 | 0.0 | 1 | 0.7 | 0 | 0.0 | 0 | 0.0 |
| National Defense | 99 | 29 | 29.3 | 0 | 0.0 | 0 | 0.0 | 2 | 2.0 | 0 | 0.0 |
| Antitrust | 15 | 1 | 6.7 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Food & Drug | 141 | 92 | 65.2 | 3 | 2.1 | 0 | 0.0 | 4 | 2.8 | 0 | 0.0 |
| Other Miscellaneous Offenses | 2,236 | 1,573 | 70.3 | 6 | 0.3 | 3 | 0.1 | 27 | 1.2 | 2 | 0.1 |



EXHIBIT
N
tabbies®

Table 27 (cont.)

| PRIMARY OFFENSE | §5K1.1 SUBSTANTIAL ASSISTANCE | | §5K3.1 EARLY DISPOSITION | | OTHER GOV'T SPONSORED | | DOWNWARD DEPARTURE[3] | | DOWNWARD DEPARTURE W/ BOOKER[3] | | BELOW RANGE W/ BOOKER[3] | | REMAINING BELOW RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 8,470 | 12.4 | 6,294 | 9.2 | 5,224 | 7.7 | 1,521 | 2.2 | 583 | 0.9 | 12,032 | 17.6 | 378 | 0.6 |
| Murder | 22 | 24.2 | 0 | 0.0 | 8 | 8.8 | 0 | 0.0 | 1 | 1.1 | 8 | 8.8 | 0 | 0.0 |
| Manslaughter | 1 | 1.9 | 0 | 0.0 | 4 | 7.7 | 0 | 0.0 | 0 | 0.0 | 8 | 15.4 | 0 | 0.0 |
| Kidnapping/Hostage Taking | 7 | 16.3 | 0 | 0.0 | 2 | 4.7 | 2 | 4.7 | 0 | 0.0 | 9 | 20.9 | 1 | 2.3 |
| Sexual Abuse | 47 | 8.9 | 0 | 0.0 | 97 | 18.4 | 4 | 0.8 | 5 | 0.9 | 105 | 19.9 | 0 | 0.0 |
| Assault | 5 | 0.7 | 4 | 0.6 | 99 | 13.8 | 10 | 1.4 | 7 | 1.0 | 109 | 15.2 | 10 | 1.4 |
| Robbery | 74 | 10.0 | 1 | 0.1 | 71 | 9.6 | 18 | 2.4 | 13 | 1.8 | 164 | 22.2 | 1 | 0.1 |
| Arson | 21 | 35.6 | 0 | 0.0 | 5 | 8.5 | 0 | 0.0 | 0 | 0.0 | 6 | 10.2 | 0 | 0.0 |
| Drugs - Trafficking | 4,931 | 24.6 | 1,222 | 6.1 | 2,059 | 10.3 | 338 | 1.7 | 219 | 1.1 | 3,869 | 19.3 | 79 | 0.4 |
| Drugs - Communication Facility | 36 | 11.4 | 4 | 1.3 | 27 | 8.5 | 1 | 0.3 | 3 | 0.9 | 76 | 24.1 | 5 | 1.6 |
| Drugs - Simple Possession | 1 | 0.2 | 2 | 0.4 | 4 | 0.9 | 0 | 0.0 | 0 | 0.0 | 7 | 1.6 | 2 | 0.4 |
| Firearms | 763 | 10.8 | 13 | 0.2 | 636 | 9.0 | 127 | 1.8 | 47 | 0.7 | 1,370 | 19.4 | 31 | 0.4 |
| Burglary/B&E | 2 | 5.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 9 | 25.0 | 1 | 2.8 |
| Auto Theft | 12 | 19.4 | 0 | 0.0 | 2 | 3.2 | 1 | 1.6 | 0 | 0.0 | 5 | 8.1 | 1 | 1.6 |
| Larceny | 55 | 6.3 | 0 | 0.0 | 70 | 8.0 | 22 | 2.5 | 13 | 1.5 | 196 | 22.5 | 15 | 1.7 |
| Fraud | 1,337 | 19.0 | 3 | 0.0 | 607 | 8.6 | 107 | 1.5 | 80 | 1.1 | 1,870 | 26.5 | 66 | 0.9 |
| Embezzlement | 16 | 4.9 | 1 | 0.3 | 27 | 8.2 | 13 | 4.0 | 0 | 0.0 | 86 | 26.1 | 2 | 0.6 |
| Forgery/Counterfeiting | 47 | 9.2 | 0 | 0.0 | 26 | 5.1 | 14 | 2.7 | 8 | 1.6 | 96 | 18.8 | 4 | 0.8 |
| Bribery | 67 | 31.0 | 1 | 0.5 | 16 | 7.4 | 3 | 1.4 | 5 | 2.3 | 57 | 26.4 | 0 | 0.0 |
| Tax | 79 | 14.1 | 0 | 0.0 | 45 | 8.1 | 17 | 3.0 | 15 | 2.7 | 239 | 42.8 | 6 | 1.1 |
| Money Laundering | 156 | 23.4 | 2 | 0.3 | 94 | 14.1 | 15 | 2.2 | 10 | 1.5 | 185 | 27.7 | 4 | 0.6 |
| Racketeering/Extortion | 218 | 21.7 | 0 | 0.0 | 134 | 13.3 | 17 | 1.7 | 12 | 1.2 | 219 | 21.8 | 10 | 1.0 |
| Gambling/Lottery | 13 | 17.1 | 1 | 1.3 | 9 | 11.8 | 1 | 1.3 | 0 | 0.0 | 13 | 17.1 | 0 | 0.0 |
| Civil Rights | 6 | 13.0 | 0 | 0.0 | 6 | 13.0 | 1 | 2.2 | 0 | 0.0 | 15 | 32.6 | 1 | 2.2 |
| Immigration | 250 | 1.2 | 5,032 | 24.4 | 441 | 2.1 | 723 | 3.5 | 80 | 0.4 | 1,829 | 8.9 | 99 | 0.5 |
| Child Pornography | 62 | 3.3 | 0 | 0.0 | 387 | 20.3 | 26 | 1.4 | 34 | 1.8 | 765 | 40.2 | 10 | 0.5 |
| Prison Offenses | 9 | 1.9 | 0 | 0.0 | 44 | 9.4 | 5 | 1.1 | 2 | 0.4 | 70 | 15.0 | 1 | 0.2 |
| Administration of Justice Offenses | 70 | 6.0 | 5 | 0.4 | 112 | 9.6 | 17 | 1.5 | 6 | 0.5 | 267 | 22.9 | 4 | 0.3 |
| Environmental/Wildlife | 23 | 16.4 | 0 | 0.0 | 12 | 8.6 | 5 | 3.6 | 2 | 1.4 | 31 | 22.1 | 3 | 2.1 |
| National Defense | 27 | 27.3 | 0 | 0.0 | 10 | 10.1 | 5 | 5.1 | 4 | 4.0 | 22 | 22.2 | 0 | 0.0 |
| Antitrust | 10 | 66.7 | 0 | 0.0 | 2 | 13.3 | 0 | 0.0 | 0 | 0.0 | 2 | 13.3 | 0 | 0.0 |
| Food & Drug | 9 | 6.4 | 0 | 0.0 | 8 | 5.7 | 5 | 3.5 | 4 | 2.8 | 15 | 10.6 | 1 | 0.7 |
| Other Miscellaneous Offenses | 94 | 4.2 | 3 | 0.1 | 160 | 7.2 | 24 | 1.1 | 13 | 0.6 | 310 | 13.9 | 21 | 0.9 |

[1] Of the 71,003 cases, 2,733 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range. Descriptions of variables used in this table are provided in Appendix A.

[2] See Tables 24-24B for a list of departure reasons comprising these categories.

[3] See Tables 25-25B for a list of departure reasons comprising these categories.

SOURCE:  U.S. Sentencing Commission, 2015 Datafile, USSCFY15.

## USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS
### Guideline Calculation Based
### Fiscal Year 2015

| Guideline and SOC | Applied | Percent |
|---|---|---|
| §2G2.2 Trafficking in Pornography | 1,603 | 2.3 |
| (a)(1) Defendant convicted of 18 U.S.C. §1466(A)(b), §2252(a)(4) or §2252A(a)(5) (BOL 18) | 733 | 45.7 |
| (a)(2) Otherwise (Base offense level 22) | 867 | 54.1 |
| (a)(2) Otherwise (Base offense level 20)[70] | 2 | 0.1 |
| (a) Base offense level 17[66] | 1 | 0.1 |
| Chapter 2 Specific Offense Characteristic Adjustments | 1,599 | 99.8 |
| (b)(1)(A) If (a)(2) applies (B) defendant only received material and (C) did not traffic material (decrease 2 levels) | 138 | 8.6 |
| (b)(1)(A) If (a)(2) applies (B) defendant only received material and (C) did not traffic material (increase 2 levels)[65] | 1 | 0.1 |
| (b)(2) Victim under the age of 12 (2 levels)[71] | 1,515 | 94.5 |
| (b)(2)(A) Offense involved distribution (§2F1.1 loss table level, but at least 5 levels)[72] | 1 | 0.1 |
| (b)(3)(A) Done for pecuniary gain (§2B1.1 loss table level, but at least 5 levels)[73] | 14 | 0.9 |
| (b)(3)(A) Done for pecuniary gain (2 levels)[65] | 1 | 0.1 |
| (b)(3)(A) Done for pecuniary gain (3 levels)[65] | 1 | 0.1 |
| (b)(3)(B) In exchange for thing of value (5 levels)[73] | 299 | 18.6 |
| (b)(3)(B) In exchange for thing of value (3 levels)[65] | 2 | 0.1 |
| (b)(3)(B) In exchange for thing of value (4 levels)[65] | 1 | 0.1 |
| (b)(3)(C) Distribution to a minor (5 levels)[73] | 14 | 0.9 |
| (b)(3)(D) Distribution to a minor to coerce to facilitate travel of a minor (6 levels) | 9 | 0.6 |
| (b)(3)(E) Distribution to a minor to coerce to engage in sexual behavior (7 levels)[73] | 6 | 0.4 |
| (b)(3)(F) Distribution other than in (b)(3)(A)-(D) (2 levels)[73] | 643 | 40.1 |

---

[70] This base offense level is not available under the guidelines, but court documentation reflected the courts's findings that this was the proper level for this offense.

[71] SOC was formerly §2G2.2(b)(1) and redesignated §2G2.2(b)(2) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

[72] SOC was changed to "pecuniary gain" on November 1, 2000.   SOC was referred to the §2B1.1 loss table on November 1, 2001. This total represents those cases referred to §2F1.1.

[73] SOC was formerly §G2.2(b)(2) and redesignated §2G2.2(b)(3) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

EXHIBIT
tabbies®
O

## USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS
### Guideline Calculation Based
### Fiscal Year 2015

| Guideline and SOC | Applied | Percent |
|---|---|---|
| §2G2.2 Trafficking in Pornography (continued) | 1,603 | 2.3 |
| (b)(4) Sadistic or masochistic conduct or other forms of violence (4 levels)[74] | 1,324 | 82.6 |
| (b)(4) Sadistic or masochistic conduct or other forms of violence (2 levels)[65] | 1 | 0.1 |
| (b)(4) Sadistic or masochistic conduct or other forms of violence (3 levels)[65] | 5 | 0.3 |
| (b)(5) Defendant engaged in a pattern of activity involving sexual exploitation (5 lvl's)[75] | 229 | 14.3 |
| (b)(6) Use of a computer (2 levels)[76] | 1,514 | 94.4 |
| (b)(7)(A) At least 10 images, but fewer than 150 (2 levels)[77] | 136 | 8.5 |
| (b)(7)(A) At least 10 images, but fewer than 150 (5 levels)[65] | 1 | 0.1 |
| (b)(7)(B) At least 150 images, but fewer than 300 (3 levels)[77] | 80 | 5.0 |
| (b)(7)(B) At least 150 images, but fewer than 300 (2 levels)[65] | 1 | 0.1 |
| (b)(7)(C) At least 300 images, but fewer than 600 (4 levels)[77] | 93 | 5.8 |
| (b)(7)(D) 600 images or more (5 levels)[77] | 1,220 | 76.1 |
| (b)(7)(D) 600 images or more (4 levels)[65] | 1 | 0.1 |
| §2G2.3 Selling or Buying Children for use in the Production of Pornography | 0 | 0.0 |
| No Specific Offense Characteristics for this guideline | NA | NA |
| §2G2.4 Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct[78] | 1 | 0.0 |
| Chapter 2 Specific Offense Characteristic Adjustments | 1 | 100.0 |
| (b)(1) Material involved a prepubescent minor or minor under the age of 12 (2 levels) | 1 | 100.0 |
| (b)(2) Offense involved possessing 10 or more books containing a visual depiction involving the sexual exploitation of a minor (2 levels) | 0 | 0.0 |
| (b)(3) Computer used (2 levels) | 1 | 100.0 |

[74] SOC was formerly §2G2.2(b)(3) and redesignated §2G2.2(b)(4) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

[75] SOC was formerly §2G2.2(b)(4) and redesignated §2G2.2(b)(5) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

[76] SOC was formerly §2G2.2(b)(5) and redesignated §2G2.2(b)(6) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

[77] SOC was formerly §2G2.2(b)(6) and redesignated §2G2.2(b)(7) on November 1, 2004. The statistics reflect all instances of the application of this SOC.

[78] Guideline was eliminated and consolidated with §2G2.2 on November 1, 2004.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 4:16-CR-00001 |
| | : | |
| v. | : | Judge Brann |
| | : | |
| ROBERT ELDER | : | Filed Via ECF |

## CERTIFICATE OF SERVICE

I, Andrew J. Shubin, Esquire, do hereby certify that the United States was served a true and correct copy of the foregoing Motion via ECF filing.

September 9, 2016

/s/ Andrew J. Shubin
Andrew J. Shubin, Esquire
Pa. Attorney ID #63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@statecollegelaw.com

*Attorney for Defendant,*
*Robert Elder*